UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

    v.                                    CASE NO. 8:22-cr-259-WFJ-AEP

OMALI YESHITELA,
    a/k/a "Joseph Waller,"
PENNY HESS,
JESSE NEVEL,
    a/k/a "Jesse Nevelsky," and
AUGUSTUS C. ROMAIN, Jr.

## UNITED STATES' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE TO EXCLUDE THE GOVERNMENT'S RUSSIA EXPERTS

The United States hereby opposes, in part, the Defendants' Motion in Limine, Dkt. 194, to exclude the testimony of the United States' two experts, Professor Thomas Rid and Professor Brian Taylor (the "Experts").[1] Profs. Rid and Taylor are qualified to testify as experts, their opinions are reliable, and their testimony is necessary for the jury to understand the evidence and make factual determinations material to this case. The Defendants' arguments to the contrary are meritless and the Motion should be denied.

To the extent that the Defendants object to testimony concerning Russian interference in the 2016 U.S. elections, the United States does not intend to elicit any such testimony. Accordingly, the United States does not oppose an order excluding testimony or cross-examination concerning that topic.

---

[1] The term "Defendants" herein relates to Defendants Penny Hess, Omali Yeshitela, and Jesse Nevel—the three defendants who filed and/or joined the instant Motion. Dkt. 196 and 198.

1

I.  **Legal Standard**

Federal Rule of Evidence 702 controls the admission of expert testimony. *United States v. Brey*, 627 Fed. App'x 775, 781 (11th Cir. 2015) (citing and quoting Fed. R. Evid. 702). In considering the admissibility of expert testimony under Rule 702, courts must consider three basic requirements: qualification, reliability, and helpfulness to the factfinder. *Id.* (citation omitted). An expert may be deemed qualified by "knowledge, skill, experience, training, or education." *Knight through Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 808 (11th Cir. 2017). A court has considerable leeway in assessing whether an opinion is sufficiently reliable and may consider a variety of factors, including whether the theory has been subject to peer review and whether the methodology is generally accepted. *United States v. Hinestroza-Newbbool*, 2022 WL 2678773, at *2 (11th Cir. July 12, 2022) (citations omitted). "And helpfulness is based on whether the testimony 'concerns matters that are beyond the understanding of the average lay person.'" *United States v. Watkins*, 880 F.3d 1221, 1227 (11th Cir. 2018).

II.  **Professors Rid and Taylor are qualified to serve as experts.**

On December 30, 2023, pursuant to Federal Rule of Evidence 16, the United States noticed Profs. Rid and Taylor as experts. Rid Disclosure, Dkt. 194-1 (disclosure and CV for Prof. Rid); Taylor Disclosure, Dkt. 194-2 (disclosure and CV for Prof. Taylor). Each disclosure contained a CV that summarized the expert's qualifications and provided a detailed overview of the expert's anticipated testimony.

2

As set forth in his CV, Prof. Rid has spent the last fifteen years as a professor of security studies at King's College in London and at Johns Hopkins School of Advanced International Studies in Washington, DC. Rid Disc. at 21-22. Before that, Prof. Rid held research fellowships, *inter alia*, at the RAND Corporation and the Wilson Center. *Id.* Prof. Rid holds masters' and PhD degrees from Humboldt University in Germany. *Id.* Prof. Rid has published three books and dozens of peer-reviewed academic articles, and is a frequent commentor in popular press outlets. *Id.* at 22-35. In March 2017, Prof. Rid testified before the U.S. Senate's Select Committee on Intelligence in connection with Russian interference in the 2016 presidential election. *Id.* at 22. Prof. Rid's area of expertise is in intelligence and military studies, which includes the history of intelligence. Prof. Rid is qualified to testify as an expert by virtue of his knowledge, experience, training, and education. *Knight through Kerr*, 856 F.3d at 808. The Defendants do not contend otherwise.

As set forth in his disclosures, Prof. Rid is expected to testify primarily on the topic of "active measures," which he defines as covert intelligence operations deployed to achieve political objectives. Rid Disc. at 11. This was the focus of Prof. Rid's most recent book, titled "Active Measures: The Secret History of Disinformation and Political Warfare." As part of this testimony, Prof. Rid will explain the concept of active measures—including who deploys them, why they are effective, and how such operations have been used by Russian intelligence services throughout history and up through the present. *Id.* at 11-18.

Prof. Taylor is equally qualified. Prof. Taylor has held professorships for more than twenty-five years, including, for the past twenty years, at Syracuse University. Taylor Disc. at 13. Prof. Taylor has published several books, written and published dozens of articles in peer-reviewed journals and other outlets, and likewise holds masters' and PhD degrees relevant to his area of expertise. *Id.* 13-16. Prof. Taylor is an expert in the structure and operations of the Russian government—an area where he has focused for the better part of forty years. As detailed in his disclosure, Prof. Taylor will testify as to the structure of the Russian Government, including, in particular, of the FSB—the leading intelligence agency in modern-day Russia. Taylor Disc. at 4-6, 10-12. Prof. Taylor is qualified to testify as an expert by virtue of his knowledge, experience, training, and education. *Knight through Kerr*, 856 F.3d at 808. The Defendants do not challenge Prof. Taylor's qualifications.

### III. The Experts' anticipated testimony is directly relevant to the United States' case-in-chief and will assist the jury in understanding the evidence and determining material facts.

The crux of the Defendants' Motion contends that the testimony of Profs. Rid and Taylor "is not relevant to the task at hand and will not help the jury understand the evidence or to determine a fact in issue." Dkt. 194 at 3-4. This is wrong because the anticipated testimony of Profs. Rid and Taylor is relevant and helpful to the jury for at least three reasons.

<u>First</u>, the Superseding Indictment charges the Defendants with violating 18 U.S.C. § 951, which makes it a crime to knowingly "act[] in the United States as an agent of a foreign government without prior notification to the Attorney General."

4

18 U.S.C. § 951(a). That the Defendants acted as an agent of a foreign government or official—here, the Russian Federation or an official thereof—is an element of a Section 951 offense that the United States must prove. *See, e.g.*, *United States v. Abouammo*, Case No. 19-cr-621(EMC) (N.D. Cal. Aug. 3, 2022), Dkt. 356 at 20-21 (jury instructions for Section 951 charge); *United States v. Michel*, Case No. 19-cr-148-1(CKK) (D.D.C. April 25, 2023), Dkt. 290 at 62-66, 71-74 (same); *United States v. McMahon et al.*, Case No. 21-cr-265(PKC) (E.D.N.Y. June 20, 2023), Dkt. 256 at 32-34 (same); *United States v. Ji Chaoqun*, Case No. 18-cr-611 (N.D. Ill. Sept. 26, 2022), Dkt. 376 at 26 (same).

      To carry its burden, the United States will introduce evidence to establish that the Defendants acted within the United States subject to the direction and control of several officers of the Federal Security Service of the Russian Federation ("FSB"). A significant portion of this evidence will reference Russian terms and phrases, nomenclature, political entities and figures, geographic locations, and other subjects that are foreign and that will be unfamiliar to the lay juror. These matters are contained in text and email communications, audio and video recorded statements, communications, audio and video-recorded statements, media publications, and evidence in other forms. As illustrated below, the Experts' anticipated testimony noticed to the Defendants will assist the jury in understanding the complex and peculiar subject matter, provide important meaning and context to this evidence, and empower the jury to evaluate other evidence probative of the Defendant's guilt.

For example, the United States' trial evidence will show that Defendants Yegor Popov and Aleksey Sukhodolov were FSB intelligence officers that, working through and in concert with Defendant Alexander Ionov, exercised direction and control over Defendants Yeshitela, Nevel, Hess, and other co-conspirators. The Experts' testimony—which is based on their decades of study, training, experience, and research—will establish that the FSB is the intelligence arm of the Russian Government. This testimony will therefore help the jury "understand the evidence." Fed. R. Evid. 702(a). Additionally, documentary evidence at trial will show that Sukhodolov served as a unit chief in the FSB's Constitutional Protection Directorate. Prof. Taylor's testimony—based on his experience and training— will explain that the FSB is organized into various sub-services and directorates, and that Sukhodolov's specific directorate is a known sub-unit of the FSB. Here, too, this testimony will help the jury understand the documentary evidence related to Sukhodolov's role as an FSB officer.  Similarly, the evidence at trial will show that Popov and Sukhodolov received written reports from Ionov that summarized what the Defendants had been tasked to do and how they had performed. Prof. Taylor will testify that the FSB regularly utilizes and relies upon use this kind of written report. Thus, Prof. Taylor's testimony will assist the jury in considering whether Ionov's written reports are consistent with FSB practices, which in turn will aid the jury in assessing whether the Defendants were acting as agents of the FSB and the Russian Government.

Second, the Superseding Indictment also charges the Defendants with conspiring to violate Section 951. To prove this charge, the United States must show an agreement amongst and between the Defendants. Here, the evidence will show an agreement between the Defendants, on the one hand, and Defendant Ionov and the Russian Government, on the other. Critically, Prof. Rid's testimony will demonstrate that the Russian Government has a standard playbook for using active measures that seek to sow discord and to drive divisions within the United States and other countries, and will explain the common features of these intelligence operations throughout history. Specifically, through his extensive experience and research in the archives of various intelligence agencies, Professor Rid has identified the following common features of active measures:

> (1) Active measures are covert intelligence operations executed by professional, organized, and dedicated government bureaucracies with an established culture of secrecy;
>
> (2) Active measures are proposed, funded, staffed, developed, and deployed to achieve a specific political objective;
>
> (3) Active measures are designed to take advantage of existing divisions, polarizations, frictions, or contradictions in the targeted society or entity; and
>
> (4) Active measures, finally, manipulate information, either by forging—in part or in full—the contents of messages; or by deceiving the intended recipients by the provenance of a document or message, for example by hiding the actual source of information or, more likely, by releasing information under false pretenses into the targeted area.

Rid Disc. at 11.

7

The Experts' testimony is therefore directly relevant to establishing the existence of this agreement—a necessary element of the conspiracy charge—because it provides Ionov and the Russian Government's *motive* for entering into the agreement. Stated differently, it will enable the jury to see the full picture: the Russian Government's motive for entering into this agreement was that the Defendants would, and in fact did, take actions intended to sow discord inside the United States—which, in turn, furthered the Russian Government's foreign policy and intelligence objectives. This is particularly helpful to the fact finder where, as is likely the case here, they may wonder why the Russian Government and several seemingly racist FSB officers would devote thousands of hours of time over seven years to cultivate a relationship with an African nationalist organization such as APSP, while also doing the same with white nationalist groups, secessionist groups, and a variety of other groups with completely incoherent viewpoints. Armed with this background knowledge, the jury will also be better positioned to fully assess the evidence at the heart of the case: email communications demonstrating that the Defendants entered into this agreement with Ionov and the Russian government fully aware of the Russian Government's motive and fully aware that the Russian Government sought to use the relationship with the defendants and other groups, including southern secessionist groups, to, in Defendants' words, "sew [sic] division inside the U.S."

Third, the Experts' testimony will also be useful to the jury in another important way: it will help the jury "understand the evidence" by providing critical

context for references to Russian phrases, symbols, and landmarks. Such references are unlikely to be familiar to a lay person or juror, but are nevertheless crucial pieces of evidence in this case. As just one of many examples, evidence at trial will include messages sent between Popov and Ionov that reference "Chekist Day." While jurors are unlikely to know the import of this phrase, Prof. Taylor will testify that the phrase relates to the term "Cheka," the name of the secret police force that existed at the founding of the Soviet Union. Taylor Disc. at 7. Similarly, evidence at trial will contain references to terms such as "the Kremlin" and "Lubyanka." Here, too, Prof. Taylor will provide important context that will enable to the jury to understand that these are references to the physical headquarters in Moscow of President Putin and the FSB, and also that they are shorthand terms used to reference the Russian Government and Russian intelligence services more generally.

In sum, these examples demonstrate how the Experts' testimony will—by providing historical context and supplemental information regarding the structure and operation of the Russian Government and the FSB—"help the trier of fact to understand the evidence" and to "determine a fact in issue." Fed. R. Evid. 702; *see also Watkins*, 880 F.3d at 1227 (explaining that expert testimony is admissible if it "concerns matters that are beyond the understanding of the average lay person"). Thus, the Motion should be denied.

Defendants' arguments to the contrary are unavailing. For example, the Defendants contend that the proffered expert testimony is "not relevant" because portions of the testimony relate to the Soviet Union. Dkt. 194 at 3-4. As an initial

9

matter, emails and other documents written by the Defendants that will be introduced at trial expressly link the Soviet Union's desire to use activist groups with that of modern Russia. Ex. A, The Crisis of Imperialism and the Way Forward at 12 (July 29, 2016) ("Yeah, the Soviet Union wants to unite with us. The Russians want a relationship with us. I'm not concerned with why the Russians want us to come there. I know why. They want to win allies to their struggle against the US. I do too!"). Moreover, as detailed above, the evidence at trial will require an understanding of terminology related to the Soviet Union, including a secret police organization—the Cheka—that operated shortly after the Russian Revolution of 1917. Moreover, a central theme of the Experts' testimony is that there exists continuity between the *modus operandi* employed by the Soviet Union's historical intelligence apparatus (i.e., the KGB) and methods used today by the FSB. *See, e.g.*, Rid Disc. at 7-11, Taylor Disc. at 7-9. Because of this, historical examples of "active measures" undertaken and perfected by the KGB—which involve similar tactics, objectives, and operations to the allegations set forth in the Superseding Indictment—are directly relevant to a jury's assessment of whether the Russian Government and the FSB were exercising direction and control over the Defendants.

      The Defendants also wrongly assert that "[w]hether or not there are other political movements in the United Sates that may have previously acted as agents of Russia has no relevance to this case." Dkt. 194 at 4. But expert testimony that the Russian Government (or the Soviet Union) has a *modus operandi* whereby it attempts to use active measures to harm the United States—including, as occurred in this

10

case, through the use of front organizations to exploit preexisting divisions within American society—is entirely proper and should be admitted. As the Eleventh Circuit has observed, "increasingly in federal courts, law enforcement officials have been allowed to testify as experts in order to establish the *modus operandi* of particular crimes." *United States v. Burchfield*, 719 F.2d 356, 358 (11th Cir. 1983) (admitting *modus operandi* evidence relating to counterfeit-bill-passing techniques to explain the action of defendants and stating that similar evidence has been admitted in a variety of contexts). Of particular significance to our case is the Eleventh Circuit's embrace of *United States v. Kampiles*, wherein the Seventh Circuit permitted expert testimony on the issue of the Soviet Union's intelligence recruiting practices, including specifically historical examples of how the Soviet Union's intelligence agencies operated. *See Burchfield*, 719 F.2d at 358 (citing approvingly the decision in *Kampiles*, 609 F.2d 1233, 1247 (7th Cir. 1979)); *see also United States ex rel. Paredes v. Res-Care*, Case No. , 2006 WL 8432666, at *6 (M.D. Fla. Feb. 13, 2006) (admitting testimony regarding an organization's routine practice under Federal Rule of Evidence 406 because such evidence "is relevant to prove that the conduct of the organization on a particular occasion was in conformity with that routine practice").

Moreover, the risk of unfair prejudice to the Defendants from testimony providing historical examples of active measures is minimal. For example, Prof. Rid may offer testimony about the World Peace Council, which—over fifty years ago—was a non-governmental organization used by Soviet intelligence in furtherance of active measures to stage protests and spread pro-Russian propaganda. The purpose

11

of such testimony is to provide the jury with a concrete example of how active measures play out in practice, in order to better understand the abstract definition provided above. There is no risk that a jury will unfairly hold such a historical example—having no tie to the defendants or the FSB officers they conspired with—against the defendants. *United States v. Jean-Charles*, 696 F. App'x 405, 409 (11th Cir. 2017) (affirming admission of expert testimony concerning general *modus operandi* of drug traffickers, and holding that the testimony was not unfairly prejudicial because it did not implicate the defendant in the offense).

Because the Experts' anticipated testimony will be helpful to the trier of facts, the Court should reject the Defendants' arguments to the contrary and deny the instant Motion.

### IV. The Experts' methodology is reliable and Defendants' objection to testimony regarding the 2016 election is moot.

Almost in passing, the Defendants assert that "the government cannot meet its burden to establish the reliability of the testimony of its Russia experts." Dkt. 194 at 4. But despite using the term "reliability"—an apparent reference to Rule 702's requirement that expert testimony be "the product of reliable principles and methods"—the Defendants do not challenge the Experts' methodology. Instead, the Defendants object that the Experts will testify to "highly disputed" facts surrounding Russian interference in the 2016 election. Dkt. 194 at 5. The United States does not intend to elicit testimony regarding Russian interference in the 2016 election and therefore the Defendants' objections are moot.

### V. The anticipated testimony is not unduly prejudicial.

Finally, the Defendants contend that testimony by Profs. Rid and Taylor "would be unfairly prejudicial to the defense." Dkt. 194 at 5. According to the Defendants, "[t]he proposed testimony would amount to fearmongering about Russia, unfairly suggesting to the jury that any alliance between the defendants and the country of Russia or its people was likely a threat to U.S. security." *Id.* But this misstates and misunderstands the proposed testimony.

As made clear in their disclosures, Profs. Rid and Taylor will testify about: (1) the structure and operations of the Russian Government, including its key intelligence agency, the FSB, and predecessor organizations such as the Cheka and the KGB; and (2) the Russian Government's historical use of active measures. This is intended to provide sober, factual testimony about concepts fundamental to the jury's understanding of the evidence in this case, not to disparage the Russian Government or its people. Importantly, neither Expert will offer any opinion whatsoever as to the Defendants' relationship with Russia. *See Jean-Charles*, 696 Fed. App'x at 409-10 (rejecting Rule 403 challenge to expert testimony on grounds that the testimony discussed the general *modus operandi* of drug trafficking and did not implicate the defendant). Nor will the Experts speak generally to alliances with "the country of Russia or its people"—rather, their testimony will focus on alliances with the Russian *government*, as that is an element required to prove a charge under Section 951.

13

## VI. Conclusion

For the reasons set forth herein, Profs. Rid and Taylor are qualified to serve as experts, their opinions are reliable, and their testimony will be helpful to the jury. That is sufficient under Rule 702. Moreover, the probative value of their testimony—by aiding the jury in its understanding of key evidence and its determination of material facts—outweighs any risk of undue prejudice. The Motion should be denied.

| | |
|---|---|
| ROGER B. HANDBERG<br>United States Attorney | By: *s/ Daniel J. Marcet*<br>DANIEL J. MARCET<br>RISHA ASOKAN<br>Assistant United States Attorneys<br>Florida Bar No. 0114104<br>400 N. Tampa St., Ste 3200, Tampa, Florida<br>813/274-6000 \| Daniel.Marcet@usdoj.gov |
| JENNIFER K. GELLIE<br>Acting Chief, Counterintelligence and Export Control Section | By: *s/ Menno Goedman*<br>MENNO GOEDMAN<br>Trial Attorney, National Security Division<br>950 Pennsylvania Ave. NW, Washington, DC<br>(202) 451-7626 \| Menno.Goedman@usdoj.gov |
| COREY R. AMUNDSON<br>Chief, Public Integrity Section | By: *s/ Demetrius D. Sumner*<br>DEMETRIUS D. SUMNER<br>Trial Attorney, Public Integrity Section<br>PA Bar No. 321406<br>1301 New York Ave., Washington, D.C.<br>202/597-0775 \| Demetrius.Sumner2@usdoj.gov |

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 12, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Ade Griffin, Esq.
Leonard Goodman, Esq.
Mutaqee Akbar, Esq.
Mark J. O'Brien, Esq

                                     */s/ Daniel J. Marcet*
                                     Daniel J. Marcet
                                     Assistant United States Attorney
                                     Florida Bar No. 0114104
                                     400 N. Tampa St., Ste. 3200
                                     Tampa, FL 33602-4798
                                     Telephone: (813) 274-6000
                                     Facsimile: (813) 274-6358
                                     E-mail: Daniel.Marcet@usdoj.gov