UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

                                  Case No.: 8:22-cr-259-WFJ-AEP

v.

JESSE NEVEL,
      a/k/a "Jesse Nevelsky"

## <u>UNITED STATES' RESPONSE TO</u><br><u>DEFENDANT'S MOTION TO SEVER</u>

In 2015, the leadership of the African People's Socialist Party ("APSP")—defendants Omali Yeshitela, Augustus C. Romain, Jr., Penny Hess, and Jesse Nevel (the "Defendants")—entered into a foreign malign influence conspiracy with codefendant Alexander Viktorovich Ionov, his Russian-government backers, and other U.S. groups. The purpose of the malign influence conspiracy, in the words of the APSP leadership, was to allow the Russian government to "utilize" the APSP "to s[o]w division inside the U.S." In late 2018, defendant Augustus C. Romain, Jr., who until then had served as a leader of the APSP, left the APSP and formed a new group called the Black Hammer. Yet the malign influence conspiracy continued uninterrupted, with both the APSP and Black Hammer continuing to receive directives from Ionov, continuing to engage in similar actions to sow division, continuing to report to Ionov concerning those actions, and continuing to monitor each other's work for Ionov and the Russian Government.

Defendant Nevel now moves the Court to sever Romain from the upcoming trial of this matter. Doc. 199. The Court should deny that Motion because the

Defendants are properly charged in a single conspiracy to pursue a common goal using a common scheme with common participants. That is all that is required. Moreover, separate trials would entail an enormous waste of judicial resources, and Nevel has not established that he will suffer any compelling prejudice from proceeding to trial alongside Romain.

## I.   BACKGROUND

### A.   Procedural History

On April 13, 2023, the Defendants were charged by Superseding Indictment with conspiring to act as agents of the Russian government without notification to the Attorney General, in violation of 18 U.S.C. §§ 371 and 951. Yeshitela, Hess, and Nevel were further charged with a substantive violation of Section 951.

On February 7, 2024, the Court scheduled trial for all four Defendants to begin on September 3, 2024.

On August 2, 2024, Nevel filed the instant Motion to Sever, arguing that he should be tried separately from defendant Romain. Defendant Yeshitela has joined that Motion. Doc. 201.

## II.   LEGAL STANDARD

Federal Rule of Criminal Procedure 8(b) provides that multiple defendants may be joined in an indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Rule 8(b) further specifies that the "defendants may be charged in one or more counts together or separately," and that each defendant does not have to be

charged in every count of the indictment. When the issue is presented before trial, the determination of whether joinder under Rule 8(b) is proper should be decided on the allegations in the charging document and any evidence proffered by the United States. *United States v. Dominguez*, 226 F.3d 1235, 1241 (11th Cir. 2000) ("It is enough when faced with a Rule 8 motion, the prosecutor proffers evidence which will show the connection between the charges.").

The Eleventh Circuit has repeatedly held that "the rule about joint trials is that 'defendants who are indicted together are usually tried together.'" *United States v. Lopez*, 649 F.3d 1222, 1234 (11th Cir. 2011) (quoting *United States v. Browne*, 505 F.3d 1229, 1268 (11th Cir. 2007)). This strong preference for joint trials recognizes that "[j]oint trials play a vital role in the criminal justice system and serve important interests: they reduce the risk of inconsistent verdicts and the unfairness inherent in serial trials, lighten the burden on victims and witnesses, increase efficiency, and conserve scarce judicial resources." *Id.*

The rule in favor of joint trials "is even more pronounced in conspiracy cases where the refrain is that 'defendants charged with a common conspiracy should be tried together.'" *Id.* (quoting *United States v. Beale*, 921 F.2d 1412, 1428 (11th Cir. 1991)). To determine whether defendants are properly charged in a single conspiracy, the Eleventh Circuit considers: "(1) whether a common goal existed; (2) the nature of the underlying scheme; and (3) the overlap of participants." *United States v. Edouard*, 485 F.3d 1324, 1347 (11th Cir. 2007). A single conspiracy exists where a "defendant's actions facilitated the endeavors of other co-conspirators or

3

facilitated the venture as a whole." *Id.* "It is irrelevant that particular conspirators may not have known other conspirators or may not have participated in every stage of the conspiracy; all that the government must prove is an agreement or common purpose to violate the law and intentional joining in this goal by co-conspirators." *Id.* (alterations adopted). Conspirators are not liable only for their own actions, but are "criminally liable for any crime committed by a coconspirator during the course and in furtherance of the conspiracy, unless the crime did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." *United States v. Alvarez*, 755 F.2d 830, 847 (11th Cir. 1985) (marks omitted).

Federal Rule of Criminal Procedure 14(a) permits a district court to "sever the defendants' trials, or provide any other relief that justice requires" if a joint trial "appears to prejudice a defendant or the government." The Eleventh Circuit has made clear, however, that "[t]he exceptional circumstances justifying a deviation from the rule" that defendants who are indicted together should be tried together "are few and far between." *Lopez*, 649 F.3d at 1234.

In order to justify a severance under Rule 14, the Defendant must first "carry the 'heavy burden of demonstrating that compelling prejudice would result' from a joint trial." *Id.* (quoting *Browne*, 505 F.3d at 1268 (alteration adopted)). "To show compelling prejudice, a defendant must establish that a joint trial would actually prejudice the defendant and that a severance is the only proper remedy for that

prejudice – jury instructions or some other remedy short of severance will not work." *Id.* But "not just any kind of prejudice will do"—a defendant seeking a severance must establish "a serious risk that a joint trial would either 'compromise a specific trial right of one of the defendants' or 'prevent the jury from making a reliable judgment about guilt or innocence' even if limiting instructions are given." *Id.* at 1234-1235 (quoting *United States v. Thompson*, 422 F.3d 1285, 1292 (11th Cir. 2005)). "Aside from those two situations, jointly indicted defendants are not entitled to a severance." *Id.*

## III.   ANALYSIS

### A. The Defendants are properly joined in the Superseding Indictment.

The Defendants are properly joined in the Superseding Indictment because they conspired together to act at the direction and control of the Russian government. As the Superseding Indictment alleges, in 2015, Yeshitela, Hess, Nevel, and Romain all knowingly entered into the same malign influence conspiracy with each other, Ionov, his Russian government backers, and other unindicted co-conspirators to act on behalf of the Russian government. All four Defendants were active members of APSP leadership from 2015 through 2018, a period during which APSP entered into its relationship with Ionov and the Russian Government, and during which APSP acted at the direction and control of the same. Superseding Indictment ¶¶ 12-14, 16. Then, in or around November 2018, Romain left APSP. But rather than leave the conspiracy, he created a new group, Black Hammer, through which he continued to work with Ionov and the Russian Government in furtherance

of the same goals. *Id.* ¶ 16; *see also* Doc. 199 at ¶ 13 ("The alleged overt acts of Romain show that he was working under the direction and control of Ionov and his organization, Black Hammer, was specifically created and used for that purpose.").

As the foregoing makes clear, this malign influence conspiracy shared "a common goal," *Edouard*, 485 F.3d at 1347, to work on behalf of the Russian government and Ionov to further the Russian government's interests and sow discord in the United States. The conspiracy involved the same "underlying scheme," *id.*, whereby: Ionov would recruit separatist groups from around the United States and elsewhere to work on behalf of the Russian government, Superseding Indictment ¶ 26(a); Ionov would communicate with his FSB overseers concerning planned actions, *id.* ¶ 26(b); Ionov would relay direction to these groups, including the APSP, Black Hammer, and U.S. Political Group 3, *id.* ¶ 26(c); the U.S. conspirators would carry out those directions and report back to Ionov, *id.* ¶ 26(c)-(g); and Ionov would report on those activities to the Russian government co-conspirators, including the charged FSB officers, *id.* ¶ 26(j). The conspiracy involved a significant "overlap of participants," *id.*, including Ionov, the charged FSB officers, and Yeshitela, Hess, Nevel, and Romain. And the conspiracy's participants continued to act in furtherance of its purpose throughout a common time period—between 2015 and 2022—until disrupted by various law enforcement actions. Finally, given that Romain met and first worked with Ionov via APSP (and, in particular, via Yeshitela) and that Romain's relationship with Ionov then continued after Romain created Black Hammer, this is a case involving a single conspiracy where actions by

Yeshitela, Nevel, and Hess, "facilitated the endeavors of other co-conspirators [i.e., Romain] or facilitated the venture as a whole." *Edouard*, 485 F.3d at 1347.

The Defendant's Motion argues that the Superseding Indictment charges multiple conspiracies—a conspiracy amongst the Russian defendants, a conspiracy amongst the APSP defendants (that somehow excludes former APSP leader Romain), a conspiracy with Romain, and a conspiracy with a California group ("U.S. Political Group 3" in the Superseding Indictment). Doc. 199 at 6-7. The Defendant also argues that the conspiracy is a "rimless wheel" conspiracy with no connection between himself, Romain, and U.S. Political Group 3. *Id.* A proper understanding of the Superseding Indictment and the evidence to be presented at trial shows that this is incorrect.

To begin with, the Superseding Indictment alleges that all four of the Defendants had joined and were acting as knowing participants in this conspiracy by September 2015, while active leaders of the APSP. The scope and purpose of the conspiracy was memorialized in a series of emails, one sent by Nevel and another sent on behalf of Yeshitela, to Hess and Romain. *See* Overt Act ("OA") ¶¶ 17-18. The emails were sent after Yeshitela attended a Russian government-sponsored conference in Moscow designed to recruit, organize, and promote political groups and separatist movements from countries around the world to partner with Ionov and secede from their home countries. *Id.* ¶¶ 15-16.

In these emails, APSP leadership explicitly recognized that they would be one of many "forces inside of the U.S." who the Russian government, through Ionov's

"Anti-Global Movement," would "utilize . . . to s[o]w division inside the U.S." *See* September 30, 2015 Email, attached hereto as Exhibit 1, at 1; *see also id.* at 3 ("That did not trouble the chairman; Russians pulling together forces throughout the world to function as an ideological and political opponent to the U.S. and to Western Europe."). Yeshitela recognized the drawbacks of working alongside "fascist" and "southern separatist groups" on behalf of Russia, *id.* at 3, but argued that doing so would also assist the APSP in pursuing its "agenda – to place the question of African self-determination on the world's agenda and to win international allies for our National Liberation Struggle," *id.* at 1. Yeshitela succinctly summarized this cynical compromise: "we have interests, Russia has interests, we recognize that and that is the basis of our relationship." *Id.* at 3. In order to ensure that the APSP reaped the most benefit from this bargain, Yeshitela assigned the "Secretary General"—a position later held by Romain—to host an "Agit Prop Conference."[1]  *Id.* at 7. The purpose of the conference was to determine "how we are going to promote the significance of the [Russia] conference" and to "blow it up; make it a big thing." *Id.*

Between 2015 and 2018, the APSP engaged in a variety of actions on behalf of the Russian government, as outlined in the Superseding Indictment. OA ¶¶ 5-31. During this time, Romain—together with his codefendants—was a leader within the APSP with full knowledge of APSP's relationship with Ionov and the Russian

---

[1] "Agitprop" is a Soviet term for a political strategy in which the techniques of agitation and propaganda are used to influence and mobilize public opinion. *See* "Agitprop," ENCYCLOPEDIA BRITANNICA, www.brittanica.com/topic/civil-society (last visited June 14, 2022).

Government. And while the Superseding Indictment does not specifically allege overt acts by Romain during this timeframe, an indictment need not describe "all overt acts that might be proven at trial." *United States v. Gbenedio*, 95 F.4th 1319, 1328 (11th Cir. 2024). Moreover, every conspirator "need not participate" in an overt act because "[o]nce a conspiracy is established, and an individual is linked to that conspiracy, an overt act committed by any conspirator is sufficient." *United States v. Schlei*, 122 F.3d 944, 975 (11th Cir. 1997).

In any event, the evidence at trial will show that Romain did participate in activities that furthered the conspiracy during his time with the APSP. For example, on January 24, 2016, as part of the APSP encampment tour that Ionov funded and directed, *see* OA ¶¶19-26, Romain filmed and published videos on the APSP website to promote the tour. *See* January 24, 2016 Article, attached hereto as Exhibit 18, at 1 ("Video from Gazi Kodzo"). Approximately one week later, on February 3, 2016, as part of that same tour, Romain led, and Nevel participated in, a protest designed to "DISTURB" the St. Petersburg, Florida City Hall. *See* "DISTURB CITY HALL MEETING" Agenda, attached hereto as Exhibit 14 (located inside of a folder entitled "AFRICANS CHARGE GENOCIDE ENCAMPMENT" in the APSP's Office in St. Petersburg). Shortly thereafter, Romain played a crucial role in the APSP's 2017 campaigns for local office, during which Nevel received offers of "campaign finance" from Ionov. *See* OA ¶31; *see also* Photograph of Nevel and Romain at 2017 Campaign Rally, attached hereto as Exhibit 17. And in January of 2018, Romain was promoted from the post of "Director of Recruitment and

Membership" to "Secretary General" of the APSP, effectively second in command of the entire APSP. *See* The Burning Spear, *New installed on African People's Socialist Party National Central Committee*, attached hereto as Exhibit 15 (describing Romain's "very important role" in the APSP); "The Leadership of the African People's Socialist Party," attached hereto as Exhibit 16, at 2 (noting Romain's continued role as Secretary General in October of 2018).

During Romain's rise through the APSP ranks, the evidence at trial will establish that APSP leadership was well aware of Ionov's efforts to sow discord by aiding U.S. Political Group 3 in its push for California's secession from the United States. For example, on December 19, 2016, Ionov's organization, the Anti-Globalization Movement of Russia ("AGMR", sent an email to Nevel notifying him that AGMR had helped U.S. Political Group 3 and Unindicted Co-conspirator-6 to open an "embassy" for California in Russia. *See* December 29, 2016 Email from AGMR to Nevel, attached hereto as Exhibit 2, at 2. Two weeks later, Hess sent an email to Yeshitela and Nevel containing a news article about Ionov's Russian-government sponsored efforts to sow discord in the United States with U.S. Political Group 3 and other secessionist groups. *See* December 30, 2016 Email, attached hereto as Exhibit 3. Hess commented that the "California Calexit movement . . . is now being supported by Russia and [Ionov's organization] AGM." *Id.*

In April of 2017, Hess sent Yeshitela and Nevel another news article entitled, "Yes California Independence Campaign Has Russian Backing, Deserves Defeat." *See* April 28, 2017 Email, attached hereto as Exhibit 4. The article noted that the

APSP and U.S. Political Group 3 were working with Ionov's organization, which the article described as "either a group that enjoys some financial backing from the Kremlin or an outright Kremlin front." *Id.* at 2, 6. Thus, at least as early as December of 2016, Ionov's efforts with U.S. Political Group 3 to sow discord in the United States were well known to the Defendants, and Ionov's subsequent actions to support California's secession from the United States were reasonably foreseeable to them. *Alvarez*, 755 F.2d at 847.

After the APSP shared these articles, the Russian government, through Ionov, used Unindicted Co-conspirator-6 and U.S. Political Group 3 to cause "turmoil" by funding a protest at the California state capitol. OA ¶¶ 32-39. Ionov reported to the FSB concerning these protests at the same time that he reported on the APSP's activities in St. Petersburg, Florida. OA ¶¶ 37, 40, 41. Thereafter, in April of 2020, Yeshitela, Nevel, and two representatives of U.S. Political Group 3 spoke at a conference that Ionov hosted on behalf of the Russian government to assist Russian-backed separatists in Ukraine. OA ¶¶ 54-56; *see also* 2020 Dialogue of Nations Speaker's List, attached hereto as Exhibit 5. And in May of 2020, Yeshitela and a leader of U.S. Political Group 3 each recorded statements at Ionov's direction celebrating these same Ukrainian separatists, which Ionov reported to the FSB. *Id.* ¶¶ 57-59; *see also* May 15, 2020 Report from Ionov to FSB, attached hereto as Exhibit 6, at 1. Thus, although it is not necessary that a defendant know all of the "other conspirators" to prove a single conspiracy, *Edouard*, 485 F.3d at 1347, the evidence at trial will establish that the APSP leadership was well aware of U.S. Political Group

3's role in this malign influence conspiracy for years, and that U.S. Political Group 3's actions were intended to further a common goal on behalf of Russia.

In late 2018 or early 2019, after the California protests discussed above, Romain relocated to Atlanta, Georgia, where he founded the Black Hammer group. Ionov's reports to the FSB, which are cited in the Superseding Indictment and will be introduced at trial, underscore the similarity of the APSP's and Black Hammer's continued activities in furtherance of the "common goal," *Edouard*, 485 F.3d at 1347, of sowing discord and furthering the Russian government's interests. *See* OA ¶¶ 54-59; *see also* Doc. 199 at ¶ 13 (conceding Romain created the Black Hammer specifically for the purpose of conspiring with Ionov and front organization).

The reports, which begin in 2020,[2] detail Ionov's work with various U.S. political groups, including the APSP, Black Hammer, and U.S. Political Group 3. For example, in May of 2020, Ionov reported to the FSB that he had spoken with Yeshitela concerning protests that the APSP was coordinating in the United States. *See* May 2020 Report from Ionov to FSB, attached hereto as Exhibit 7, at 1-4. On June 12, 2020, Ionov informed the FSB that Hess, Nevel, and Romain (referred to by his nickname, "Gazi Kodzo") had provided information concerning the similar protest activities of their respective groups. *See* OA ¶ 60; June 12, 2020 Report from Ionov to FSB, attached hereto as Exhibit 8, at 1-4 (noting that Hess had "reminded"

---

[2] While the evidence establishes that Ionov was writing reports for his FSB handlers long before 2020, search warrants conducted during the investigation only returned reports from 2020 until 2022. The reports attached hereto comprise translated relevant portions of the reports from Russian to English.

Ionov that his support had enabled the APSP to prepare "many activists" to "take to the streets and lead the way for hundreds of people," and that Romain had spoken "at a protest rally in Chicago that gathered a crowd of 40,000 people").

On September 3, 2020, Ionov reported to the FSB concerning his "joint informational influence, financial grants, and events" with the APSP. *See* September 3, 2020 Report from Ionov to the FSB, attached hereto as Exhibit 9, at 2-3. One week later, on September 10, OA ¶ 61, he reported to the FSB about the Black Hammer's "latest rallies" and interviews Ionov had arranged for Romain in the Russian media. *See* September 10, 2020 Report from Ionov to the FSB, attached hereto as Exhibit 10, at 1. These reports continued into 2021, with Ionov reporting to the FSB in July of 2021 that Hess had requested that an APSP delegation could "fly to Moscow in order to improve their international standing" because, without his support, "it is difficult for them to gain access to the international press." *See* OA ¶ 65; July 16, 2021 Report, attached hereto as Exhibit 11, at 5-6.

On February 24, 2022, Russia invaded Ukraine. Ionov enlisted both the APSP and Black Hammer to assist the Russian government in its "information war" against the United States. OA ¶¶ 72-73. Between February 27 and March 20, Yeshitela, Hess, and Nevel hosted several conferences to assist Ionov in the information war. *Id.* ¶¶ 68-75. For example, on March 17, Yeshitela hosted a press conference, in part, to attack a U.S. social media company that Ionov believed had engaged in censorship of pro-invasion views. *Id.* ¶ 71. Ionov simultaneously directed Romain to engage in a series of protests in support of the Russian invasion: the first

at the same social media company that Yeshitela had attacked less than a week earlier; the second at a news media company that Ionov believed had promoted anti-invasion views; and the third at a state capitol building. *Id.* ¶¶ 76 to 94. During one of these protests, Romain compared the success of his actions to Yeshitela's actions on behalf of the Russian government, boasting that "Omali [Yeshitela] could never do what I do." *Id.* ¶ 87.

In addition to these allegations in the Superseding Indictment, the evidence at trial will establish that, while Romain was carrying out all of these actions on behalf of Russia, defendant Nevel specifically sought out information about Romain's activities with Ionov. For example, a search of a laptop belonging to Nevel revealed that, in March and April of 2022, Nevel conducted Internet searches for "gazi kodzo alexander ionov" and for "gazi kodzo." *See* Nevel Search History, attached hereto as Exhibit 12, at 1-2, 10. The evidence at trial will further establish that, one week after Black Hammer's protest at the social media company, the APSP planned and executed a virtually identical protest at the same social media company, "demand[ing] an end to [Social Media Company] censorship of Russia and Africa." *See* March 28, 2022 Email to Nevel, attached hereto as Exhibit 12, at 2. Thus, the evidence will establish that after Romain left the APSP, Yeshitela, Hess, Nevel, and Romain were not only well aware of each other's activities in furtherance of the common goals of the conspiracy, but that they continued to use similar tactics and monitored and compared the success of their activities to each other. Given the common goal of the conspiracy, the similarity of the underlying scheme, and the

overlap of participants, Yeshitela, Hess, Nevel, and Romain are properly charged in a single conspiracy. *Edouard*, 485 F.3d at 1347.

Defendant Nevel contends that Romain was "expelled" from the APSP. Doc. 199 at 3. He does not contend—much less provide any evidence to establish—that the APSP or Romain withdrew from the conspiracy with Ionov and his Russian-government backers. "It is well settled that an accused conspirator's participation in a criminal conspiracy is presumed to continue until all the objects of the conspiracy have been accomplished or until the last overt act is committed by any of the conspirators." *United States v. Bergman*, 852 F.3d 1046, 1061 (11th Cir. 2017). Withdrawal "is an affirmative defense, which the defendant has the burden of proving by a preponderance of the evidence in order to overcome the presumption of his continued participation in the conspiracy." *Id.* The defendant bears a "substantial" burden to prove that "he undertook affirmative steps . . . to disavow or to defeat the conspiratorial objectives," and that he "communicated those acts in a manner reasonably calculated to reach his co-conspirators or disclosed the illegal scheme to law enforcement authorities." *Id.* Far from withdrawing from the conspiracy, Yeshitela, Hess, Nevel, and Romain all continued their work for Ionov and his Russian-government backers unabated after Romain founded the Black Hammer. Because their actions were reasonably foreseeable to each other and fell within the scope of the same "unlawful project" to help Ionov sow discord on behalf of the Russian government, they are criminally liable for each other's actions. *Alvarez*, 755 F.2d at 847.

15

The Defendant's attempt to cast the conspiracy in this case as a "rimless wheel" is also misguided. In *United States v. Huff*, the Eleventh Circuit explained:

> A 'hub-and-spoke' conspiracy occurs where 'a central core of conspirators recruits separate groups of co-conspirators to carry out the various functions of the illegal enterprise." *United States v. Chandler*, 388 F.3d 796, 807 (11th Cir.2004). "The core conspirators move from spoke to spoke, directing the functions of the conspiracy." *Id.* Where only one conspirator moves from spoke to spoke, however, the conspiracy is analogous to a "rimless wheel," with nothing connecting the separate spokes into a single conspiracy. *Id.*

609 F.3d 1240, 1243-44 (11th Cir. 2010).

To begin with, this argument misconceives the nature and structure of this conspiracy. This conspiracy is not a hub-and-spoke organization (even a legally permissible one) because, as explained above, the Superseding Indictment alleges and the evidence at trial will show that Yeshitela, Hess, Nevel, and Romain were not only aware of each other's roles, along with those of Ionov and the Russian government, but they coordinated with each other in furtherance of the conspiracy. In fact, all four of these defendants were part of the same organization—APSP—at the time the relationship with Ionov and the Russian Government originated. These same defendants then remained a part of APSP as it began to act at the direction and control of Ionov and the Russian Government. And only later, in 2018, did Romain create a splinter organization for the express purpose of continuing to work for Ionov and the Russian Government in parallel to APSP. There is, therefore, not a central group of conspirators moving from spoke-to-spoke, but rather a network of independent conspirators working together to achieve a common goal.

Nevertheless, even assuming arguendo that this conspiracy is a hub-and-spoke conspiracy, it is certainly not a rimless wheel conspiracy because Ionov was not the only participant to move between the spokes. Rather, Yeshitela, Hess, Nevel, and Romain were well aware at the time they joined the conspiracy that they were entering into a joint venture with Ionov, who was being used as an instrument of his Russian government backers. *See* Exhibit 1 at 3 (observing that "it is clear that [Ionov's organization] is [an] instrument of Russian government"). It was, therefore, not only Ionov who moved from spoke to spoke in the conspiracy, but Ionov, the indicted FSB officers, and others who worked to direct the actions of a wide variety of U.S. groups, including the APSP, Black Hammer, and U.S. Political Group 3.

For these reasons, the Defendants were all involved in a single conspiracy. They, therefore, are properly joined in the Superseding Indictment under Rule 8(b).

## B.  Defendant Nevel will not be prejudiced by joinder with Romain.

The Defendants are properly charged in a single conspiracy. Therefore, the "even more pronounced" rule in favor of a joint trial is applicable here. *Lopez*, 649 F.3d at 1234. Given that all of the Defendants joined the malign influence conspiracy at approximately the same time in 2015 and all of the conduct alleged in the Superseding Indictment was either actually known or reasonably foreseeable to each of them, the case-in-chief of the United States will involve the presentation of all of the same evidence, regardless of which Defendants proceed to trial. Severance, therefore, would result in an extraordinary waste of judicial sources, with the Court, jurors, prosecutors, and witnesses being required to try a lengthy case with identical

evidence multiple times. Such an extraordinary waste of resources militates heavily against severance. *See Richardson v. Marsh*, 481 U.S. 200, 210 (1987) ("It would impair both the efficiency and the fairness of the criminal justice system to require ... that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendant who have the advantage of knowing the prosecution's case beforehand.").

Defendant Nevel, nevertheless, argues that severance is required because "Romain has filed several motions pro se that concerns Yeshitela, Hess, and Nevel that he may display behavior at trial that will be negatively attributable to them and this will be highly prejudicial." Doc. 199 at 10. He further argues that he will be "forced into a circumstance of defending against conduct that is not [his] own." *Id.* These arguments fall far short of carrying the "heavy burden of demonstrating that compelling prejudice would result from a joint trial." *Lopez*, 649 F.3d at 1234.

Nevel's vague concern about Romain's "behavior" at trial does not demonstrate compelling prejudice. Romain has been present at numerous proceedings throughout this case and has always behaved respectfully and displayed appropriate decorum. Moreover, Romain is represented by a highly competent, experienced criminal defense attorney who will ensure that his client behaves appropriately in court, whether as his counsel during the trial or as standby counsel if Romain elects to proceed *pro se*. And this Court no doubt has a variety of methods at its disposal to address unruly defendants, should the need arise. At bottom, the

presence of an unpredictable co-defendant is neither compelling prejudice nor a basis for incurring the extraordinary costs that will result from separate trials.

Nevel's argument that he will have to defend against Romain's actions at trial is equally unavailing. Nevel speculates, without explanation, that Romain's activities are somehow more prejudicial than his own activities. As explained in the preceding section, the alleged actions undertaken by the APSP and Black Hammer involve virtually identical protests, publications, and reporting to Ionov. Nevel has given the Court no reason to believe that the jury's hearing evidence of Romain's protests on behalf of Ionov—which are virtually identical to activities engaged in by the APSP during this timeframe—will "compromise a specific trial right" or "prevent the jury from making a reliable judgment about guilt or innocence even if limiting instructions are given." *Lopez*, 649 F.3d at 1234 (internal marks omitted).

Moreover, severance would not save Nevel from having to defend against Romain's (or U.S. Political Group 3's) reasonably foreseeable activities in furtherance of the conspiracy. Regardless of whether Romain is seated at trial, the United States will present the same evidence concerning Romain's actions and the jury will be able to consider whether they were reasonably foreseeable to Nevel. *See Alvarez*, 755 F.2d at 847.

Finally, any risk of unfair prejudice will be mitigated by the jury instructions in this case. The Eleventh Circuit has repeatedly held that "[t]he jury is presumed to follow the district court's instructions." *United States v. Siegelman*, 640 F.3d 1159, 1184 (11th Cir. 2011). In this case, the jury will be told that the United States must

establish Nevel's knowing entry into the conspiracy beyond a reasonable doubt, and that it "must consider the case of each Defendant separately and individually." 11th Circuit Pattern Jury Instructions, B10.4. Whether this trial involves three defendants or four, this instruction will be sufficient to ensure that the jury separately considers the evidence against each defendant in rendering its verdict.

## IV.   CONCLUSION

The United States respectfully requests that the Court deny defendant Nevel's Motion to Sever.

Respectfully submitted,

ROGER B. HANDBERG          By: *s/ Daniel J. Marcet*
United States Attorney          DANIEL J. MARCET
                                RISHA ASOKAN
                                Assistant United States Attorneys
                                Florida Bar No. 0114104
                                400 N. Tampa St., Ste 3200, Tampa, Florida
                                813/274-6000 | Daniel.Marcet@usdoj.gov

JENNIFER K. GELLIE          By: *s/ Menno Goedman*
Acting Chief, Counterintelligence   MENNO GOEDMAN
and Export Control Section      Trial Attorney, National Security Division
                                950 Pennsylvania Ave. NW, Washington, DC
                                (202) 451-7626 | Menno.Goedman@usdoj.gov

COREY R. AMUNDSON          By: *s/ Demetrius D. Sumner*
Chief, Public Integrity Section   DEMETRIUS D. SUMNER
                                Trial Attorney, Public Integrity Section
                                PA Bar No. 321406
                                1301 New York Ave., Washington, D.C.
                                202/597-0775 | Demetrius.Sumner2@usdoj.gov

**U.S. v. Ionov, et al.**                    **Case No. 8:22-cr-259-WFJ/AEP**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 12, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Ade Griffin, Esq.
Leonard Goodman, Esq.
Mutaqee Akbar, Esq.
Mark O'Brien, Esq.

*/s/ Daniel J. Marcet*
Daniel J. Marcet
Assistant United States Attorney
Florida Bar No. 0114104
400 N. Tampa St., Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
E-mail: Daniel.Marcet@usdoj.gov