# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| PLAINTIFF, ) | |
| ) | |
| v. ) | No. 8:22-cr-00259-WFJ-AEP |
| ) | |
| OMALI YESHITELA, *ET AL.*, ) | |
| ) | |
| DEFENDANTS. ) | |
| ) | |
| ) | |

PROPOSED BRIEF OF *AMICUS CURIAE*

NATIONAL LAWYERS GUILD CHICAGO CHAPTER IN SUPPORT OF

DEFENDANTS OMALI YESHITELA, PENNY HESS, & JESSE NEVEL

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................i-ii

STATEMENT OF INTEREST OF *AMICUS CURIAE*............................................iii

SUMMARY OF ARGUMENT..............................................................................iv

ARGUMENT........................................................................................................ 1

    I.    THE GOVERNMENT'S HISTORY OF ABUSING FIRST AMENDMENT RIGHTS UNDER THE GUISE OF NATIONAL SECURITY................................................................................1

    II.    THIS PROSECUTION VIOLATES THE UHURU 3'S FIRST AMENDMENT RIGHTS.........................................................................6

        A.    This Prosecution under 18 U.S.C. § 951 Is Content-Based As Applied..........................................................................7

        B.    Claims of National Security Do Not Lessen The Government's Required Burden ............................................12

CONCLUSION...................................................................................................14

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. American Civil Liberties Union*,
   535 U.S. 564 (2002) .................................................................................. 7-8
*Ashcroft v. Free Speech Coal.*,
   535 U.S. 234 (2002) ..................................................................................... 7
*Bolger v. Youngs Drug Products Corp.*,
   463 U.S. 60 (1983) ....................................................................................... 7
*Carey v. Brown*,
   447 U.S. 455 ............................................................................................... 13
*Chaplinsky v. New Hampshire*,
   315 U.S. 568 (1942) ............................................................................... 8, 10
*F.C.C. v. League of Women Voters*,
   468 U.S. 364 (1984) ................................................................................... 13
*First Nat'l Bank v. Belloti*,
   435 U.S. 765 (1978) ................................................................................... 11
*Giboney v. Empire Storage & Ice Co.*,
   336 U.S. 490 (1949) .................................................................................. 8-9
*Hamdi v. Rumsfeld*,
   542 U.S. 507 (2004) ................................................................................... 14
*Holder v. Humanitarian Law Project*,
   130 S. Ct. 2705 (2010) .......................................................................... 10-11
*In re Washington Post Co.*,
   807 F.2d 383 (4th Cir. 1986) ..................................................................... 14
*Lovel v. Griffin*,
   303 U.S. 444, 58 S. Ct. 666, 82 L.Ed. 949 ................................................ 12
*Martin v. City of Struthers, Ohio*,
   319 U.S. 141 (1943) ................................................................................... 12
*Mitchell v. Forsyth*,
   472 U.S. 511, (1985) ............................................................................ 13-14
*N.Y. Times Co. v. United States*,
   403 U.S. 713 (1971) ................................................................................... 13
*NAACP v. Patterson*,
   357 U.S. 449 (1958) ................................................................................... 12
*R.A.V. v. City of St. Paul*,
   505 U.S. 377 (1992) ............................................................................. 9, 13
*Reed v. Town of Gilbert, Ariz.*,
   576 U.S. 155 (2015) .................................................................................. 6-7
*Rumsfeld v. FAIR*,
   547 U.S. 47 (2006) ....................................................................................... 9
*Texas v. Johnson*,
   491 U.S. 397 (1989) ................................................................................... 11

*Turner Broad. Sys., Inc. v. F.C.C.*,
   512 U.S. 622 (1994) ........................................................................................ 12
*U.S. v. U.S. Dist. Ct. for E. Dist. Of Mich., S. Div.*,
   407 U.S. 297 (1972) ........................................................................................ 14
*United States v. Alvarez*,
   567 U.S. 709 (2012) ..................................................................................... 8, 10
*United States v. Stevens*,
   559 U.S. 460, (2010) .................................................................................... 8, 10
*W Va. State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) ........................................................................................ 11
*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) .......................................................................................... 6
*Ziglar v. Abbasi*,
   582 U.S. 120 (2017) ........................................................................................ 13

**Statutes**

18 U.S.C. § 951 ........................................................................................................ 9-10

**Other Authorities**

*Against Strict Scrutiny: The Supreme Court's Quiet Degradation of First Amendment Speech Protection*,
   70 U. Kan. L. Rev. 39 (2021) ............................................................................. 7
*An Empirical Study of 18 U.S.C. § 951*,
   46 Am. J. Trial Advoc. 53 (2022) ...................................................................... 5
*If the Feds Watching: The F.B.I.'s Use of a "Black Identity Extremist" domestic Terrorism Designation to target Black Activists and Violate Equal Protection*,
   62 How.L.J. 907 (2019) ................................................................................. 4, 6
*Imperialism and Black Dissent*,
   75 Stan. L. Rev. 397 (2023) ............................................................................... 1
*Playing A "Labeling Game": Classifying Expression As Conduct As A Means of Circumventing First Amendment Analysis*,
   56 B.C. L. Rev. 767 (2015) .............................................................................. 11
*Russian Election Interference and Race-Baiting*,
   9 Colum. J. Race & L. 191 (2019) ................................................................. 2-3
*The First Amendment's Borders: The Place of Holder v. Humanitarian Law Project in First Amendment Doctrine*,
   6 Harv. L. & Pol'y Rev. 147 (2012) ................................................................. 13
*The 'Speech Integral to Criminal Conduct' Exception*,
   101 Cornell L. Rev. 981 (2016) ...................................................................... 8, 9
*Whose Liberty? Whose Security? The USA Patriot Act in the Context of Cointelpro and the Unlawful Repression of Political Dissent*,
   81 Or. L. Rev. 1051 (2002) ....................................................................... *passim*

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

This amicus brief is submitted by the Chicago Chapter of the National Lawyers Guild, Inc. ("NLG").  The NLG was formed in 1937 as the nation's first racially inclusive voluntary national bar association. *Amici* have championed the First Amendment right to engage in political dissent and unpopular speech for over seven decades. *Amici* have a long history of defending individuals accused by the government of espousing dangerous ideas, including in hearings conducted by the House Committee on Un-American Activities and other examples of governmental overreaching that are now popularly discredited. *See, e.g.*, *Kinoy v. District of Columbia*, 400 F.2d 761 (D.C. Cir. 1968). *Amici* also defended FBI-targeted members of the Black Panther Party and assisted in exposing the illegal FBI and CIA surveillance, infiltration, and disruption tactics detailed in the 1975-1976 COINTELPRO[1] hearings.  Black political expression, advocacy, and organization continues to be unlawfully surveilled and criminalized by the United States government and its agencies, and this chilling reality is evidenced in this prosecution. Consistent with its mission to protect First Amendment rights and civil liberties, *Amici* hereby submit this amicus brief in support of Defendants Omali Yeshitela, Penny Hess, and Jesse Nevel (hereinafter the "Uhuru 3").

---

[1] *COINTELPRO*, Fed. Bureau of Investigations, https://vaultfbi.gov/cointel-pro (last accessed July 4, 2024); COINTELPRO "has come to refer to a broad range of FBI programs, generally illegal, intended to repress political dissent." Natsu Taylor Saito, *Whose Liberty? Whose Security? The USA Patriot Act in the Context of Cointelpro and the Unlawful Repression of Political Dissent*, 81 Or. L. Rev. 1051, 1079 (2002).

iii

## SUMMARY OF ARGUMENT

This amicus brief seeks to contextualize this case against the United States' flagrant history of using the law and law enforcement to suppress the First Amendment rights of individuals and organizations that struggle for social justice. Part I establishes the historical context of the United States' suppression and attempted eradication of Black-led political speech, organization, and dissent. Part II addresses how this prosecution violates the First Amendment rights of Defendants Omali Yeshitela, Penny Hess, and Jesse Nevel (the "Uhuru 3").

A review of America's historical response to Black expression and association reflects a clear and recurring theme: those "who disagree with government policy are labeled 'un-American' and, whenever possible, portrayed as agents of foreign powers." Natsu Taylor Saito, *Whose Liberty? Whose Security? The USA Patriot Act in the Context of CointelPro and the Unlawful Repression of Political Dissent*, 81 Or. L. Rev. 1051, 1066 (2002). This case illustrates the government's historical pattern of silencing political dissent by falsely branding outspoken citizens exercising their free speech rights as "foreign agents." *Amici* encourages this Honorable Court to see this prosecution for what it is: an unconstitutional attack on the Uhuru 3's First Amendment speech and association.

iv

# ARGUMENT

I. **THE GOVERNMENT'S HISTORY OF ABUSING FIRST AMENDMENT RIGHTS UNDER THE GUISE OF NATIONAL SECURITY.**

Neither this case nor the First Amendment exist "in a historical or political vacuum."[2] This case is not the first time the Government has used national security as a pretext to violate the constitutional rights of American citizens exercising their politically unpopular free speech. Nor is it the first time that the Government has done so with Defendant African People's Socialist Party ("APSP") Chairman Omali Yeshitela. During the Civil Rights era, the FBI targeted the Black community and Black civil rights leadership and organizations via COINTELPRO (COunter INTELligence PROgrams) under the guise of "national security" concerns to justify the Government's illegal operations.[3] "Although these programs had almost nothing to do with countering foreign intelligence, the use of the term illustrates the agency's proclivity to invoke the fear of external threats to the national security while quashing domestic movements which were primarily engaged in lawful-- indeed, constitutionally protected--activities."[4]

---

[2] Nina Farnia, *Imperialism and Black Dissent*, 75 Stan. L. Rev. 397, 402 (2023).

[3] Illegal FBI operations utilized during COINTELPRO can be categorized into the following broad categories: surveillance and infiltration; dissemination of false information; creation of group conflict; abuse of the criminal justice system; and collaboration in assaults and assassinations. Saito, *supra*, note 1, at 1079.

[4] *Id.*

1

Individuals and organizations that advocated for civil rights and equal protection were treated as national security threats.[5] "Rather than treat African Americans as citizens deserving of national security protection, state institutions and agents often failed to intervene or participated in the terror against Black communities." *Id.* at 219-220. Indeed, per a 1967 memorandum from then FBI Director J. Edgar Hoover ("Hoover"), the purpose of COINTELPRO was to "expose, disrupt, misdirect, discredit, or otherwise neutralize the activities of [B]lack nationalists […] their leadership, spokesmen, membership, and supporters[.]"[6] When an FBI field office sent Hoover a letter critiquing the program and its expansive tactics, including "concerns about attacking the Black Panther Party's Breakfast for Children program, which was receiving humanitarian assistance from both Black and white organizations and churches around the country[,]" Hoover's response was that the field office had "obviously missed the point." *Id.* at 447. Unsurprisingly, the Black Panther Party's political and educational newsletter, which discussed the relationship between white supremacy, capitalism, and imperialism, was also targeted and suppressed by the Government. *Id.* at 448.

---

[5] Darin E.W. Johnson, *Russian Election Interference and Race-Baiting*, 9 Colum. J. Race & L. 191, 225 (2019) (FBI targets included influential and "potentially influential" individuals such as Martin Luther King Jr. and Fred Hampton and organizations such as the National Association for the Advancement of Colored People ("NAACP")).

[6] Saito, *supra*, note 1, at 1094.

"The civil rights movement challenged a racially discriminatory status quo in America—this meant that for J. Edgar Hoover's FBI, protecting the national security of the United States was synonymous with maintenance of a legal-political system that protected white supremacy." *Id.* at 226. Hoover's notorious fear of a Black messiah "indicates a distorted view and fear of race held by the most senior leadership of the national security community."[7] The effects of this fear and paranoia surrounding Black political expression and advocacy has persisted to this day.

Per the FBI's COINTELPRO webpage, COINTELPRO was "later rightfully criticized by Congress and the American people for abridging first amendment rights and for other reasons." *COINTELPRO*, Fed. Bureau of Investigations, https://vaultfbi.gov/cointel-pro (last accessed July 4, 2024).[8] The government's public pronouncements against its past–and admittedly unconstitutional–actions ring hollow as similar tactics resurface time and time again.[9] In 2017, the FBI created its latest iteration of unconstitutional targeting, surveillance, and prosecution of Black individuals and Black-led organizations through its new

---

[7] Johnson, *supra*, note 5, at 225.

[8] "In 1975, the Senate created the Select Committee to Study Governmental Operations with Respect to Intelligence Activities (also known as the "Church Committee" after its chair, Senator Frank Church of Idaho) to investigate 'the extent, if any, to which illegal, improper, or unethical activities were engaged in' by the intelligence agencies, including the FBI and CIA's infiltration of domestic organizations." Johnson, *supra*, note 5, at 227.

[9] Jeanne Theoharis, *Comey Says FBI's Surveillance of MLK Was "Shameful" - but Comey's FBI Targeted Black Activists and Muslim Communities Anyway*, THE INTERCEPT (Apr. 24, 2018), https://theintercept.com/2018/04/24/james-comey-mlk-martin-luther-king-surveillance-muslims/.

"threat" classification: the "Black Identity Extremist[10]" ("BIE") as detailed in an Intelligence Assessment titled *Black Identity Extremists Likely Motivated to Target Law Enforcement Officers*.

This Assessment–distributed to more than 18,000 law enforcement agencies across the country–argued the existence of an alleged BIE ideology based on six isolated incidents of violence against police officers. It further states the "ideologically motivated, violent criminal activity" against police officers was being committed in response to "alleged police abuse against African Americans" and "perceptions of police brutality." *Black Identity Extremists Likely Motivated to Target Law Enforcement Officers*, FBI Counterterrorism Division Intelligence Assessment, August 2017.[11] "The problem with the FBI stating that these abuses are 'alleged' and 'perceived' is that it ignores the real, historic, and persistent problem of brutality faced by [B]lack Americans at the hands of law enforcement in the United States."[12] This Assessment illustrates the Government's continued penchant for deliberate infringement of First Amendment rights and protections against Black speech and political expression.

---

[10] Jana Winter & Sharon Weinberger, The FBI's New U.S. Terrorist Threat: Black Identity Extremists, Foreign Policy (Oct. 6, 2017), available at https://foreignpolicy.com/2017/10/06/the-fbi-has-identified-a-new-domestic-terrorist-threat-and-its-black-identity-extremists/' ; Kate Irby, White and Far-Right Extremists Kill More Cops, But FBI Tracks Black Extremists More Closely, Many Worry, McClatchy (Jan. 25, 2018), available at https://www.mcclatchydc.com/news/nation-world/national/article196423174.html.

[11] Accessible at https://www.documentcloud.org/documents/4067711-BIE-Redacted.html.

[12] Aleena Aspervil, *If the Feds Watching: The F.B.I.'s Use of a "Black Identity Extremist" domestic Terrorism Designation to target Black Activists and Violate Equal Protection*, 62 How.L.J. 907, 908-09 (2019).

In each of these vignettes, the Government's unlawful surveillance and targeting was not a collection of inadvertent mistakes; it was a calculated suppression of the First Amendment rights and protections belonging to these citizens and organizations. [13] And yet, despite this vast, tarnished history of deliberate First Amendment violations, the Government relies on its prior tactics in this prosecution to accomplish the same goal: attempted suppression of political speech. [14]

In 1972, Defendant Chairman Omali Yeshitela founded APSP. APSP's predecessor organization, Junta of Militant Organizations ("JOMO"), was a governmental target during COINTELPRO.[15] Since 1972, APSP has advocated for the rights of African people throughout the world to be free from colonialism, *i.e.*, "a condition of existence where a whole people is oppressively dominated by a foreign and alien state power for the purpose of economic exploitation and political advantage."[16] APSP disseminates its messages through a variety of platforms

---

[13] J. Edgar Hoover wanted his intended targets to believe there "was an FBI agent behind every mailbox" and "engag[ed] in such activities precisely because of the chilling effect they would have on speech and associational activities protected by the First Amendment." Saito, *supra*, note 1, at 1082.

[14] "[T]he composition and trend in § 951 defendants' "foreign governments" and countries of affiliation […] provide[s] a clear picture […] to perceive the geopolitical trends between the United States and its international rivals over the past few decades, as well as the American response to potential threats involving national security." Huan-Ting Wu & Daniel B. Olmos, *An Empirical Study of 18 U.S.C. § 951*, 46 Am. J. Trial Advoc. 53, 76 (2022).

[15] Senate Select Comm. to Study Governmental Operations with Respect to Intelligence Activities, Final Report, S.Rep.No.755, 94th Cong., 2d Sess., Book III, IV-A-3 (1976).

[16] *The Working Platform of the African People's Socialist Party*, African People's Socialist Party, https://apspuhuru.org/about/platform/(adopted Sept. 23, 1979).

including: their newspaper, *The Burning Spear*; their radio station; and the internet.[17] As demonstrated by this prosecution of the Uhuru 3, Black political expression, advocacy, and organization is still viewed as a significant threat.[18]

The preceding section is only a glimpse into how the United States has continuously used the guise of national security to criminalize and silence voices it disagrees with. Rather than disregarding the Government's historical and unconstitutional criminalization of Black political expression and association, the Court must account for its impact in this case.

## II. THIS PROSECUTION VIOLATES THE UHURU 3'S FIRST AMENDMENT RIGHTS.

The Government attempts to distance itself from First Amendment concerns by claiming its argument hinges on conduct, not speech. This argument fails. Because the Government relies on the content of the Uhuru 3's speech to justify this prosecution, their First Amendment rights and protections are clearly implicated, so strict scrutiny applies. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 164 (2015) (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989)) (even facially content-neutral laws will be considered content-based regulations on speech if law cannot be justified without reference to the content of the regulated

---

[17] ECF No. 107, pp. 1-4 (additional information regarding APSP and the different avenues of free speech expression utilized by APSP).

[18] "Black Americans face constitutional violations from arguably more insidious forces– federal agencies. These violations come in the form of intelligence assessments like the BIE assessment and internal policies that criminalize opinions critical of the U.S. Government." Aspervil, *supra*, note 12, at 910.

6

speech). The Government's attempted reliance on the "speech integral to criminal conduct" exception is inapplicable and inadvertently concedes that this prosecution is content-based as applied. In addition, the Government's claims of national security do not lessen their required burden.

### A. This Prosecution under 18 U.S.C. § 951 is Content-Based as Applied.

"[A]s a general matter, 'the First Amendment means that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002) (alteration in original) (quoting *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 65 (1983)). First Amendment jurisprudence has recognized that "there is a critical distinction between ideas and action, and that while the former may inspire the latter, only the latter may be criminally sanctioned."[19] Content-based restrictions on speech are ordinarily subject to strict scrutiny. *Reed*, 576 U.S. at 163-64. A law is content based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 163. Strict scrutiny permits the government to restrict speech "only if [it] proves that [its restrictions] are narrowly tailored to serve compelling state interests." *Id.*

Like most constitutional principles, the right to free speech is not absolute. *Ashcroft*, 535 U.S. at 573. Exceptions exist, including the speech integral

---

[19] Wayne Batchis, *Against Strict Scrutiny: The Supreme Court's Quiet Degradation of First Amendment Speech Protection*, 70 U. Kan. L. Rev. 39, 52–53 (2021); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002) ("the Court's First Amendment cases draw vital distinctions between words and deeds, between ideas and conduct").

7

to criminal conduct exception. These "narrowly limited classes of speech" are so well-established that they are able to be regulated by the government without having to satisfy strict scrutiny.[20] The exception to strict scrutiny for speech integral to unlawful conduct (hereinafter the "*Giboney* exception") originated from *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949). There, the Supreme Court held "the constitutional freedom for speech … [does not] extend […] its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute." *Id.* at 498.

In order for the *Giboney* exception to apply, the speech must be integral to conduct constituting another offense that does not involve protected speech. *Id.* This exception "can't justify treating speech as 'integral to illegal conduct' […] when the speech violates a law that equally forbids both conduct and speech[.]"[21] And this exception "can't justify treating speech as 'integral to illegal conduct' simply because the speech is illegal under the law that is being challenged. That should be obvious, since the whole point of modern First Amendment doctrine is to protect speech against many laws that make such speech illegal." *Id.* at 987.

---

[20] *United States v. Stevens*, 559 U.S. 460, 468-69, (2010) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942)); *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality opinion) (listing unprotected categories including incitement to violence, obscenity, defamation, speech integral to criminal conduct, fighting words, child pornography, fraud, true threats, and speech presenting some grave and imminent threat the government has the power to prevent).

[21] Eugene Volokh, *The 'Speech Integral to Criminal Conduct' Exception*, 101 Cornell L. Rev. 981, 988 (2016).

Both the Magistrate Judge and the Government argue that insofar as this prosecution is based on the Uhuru 3's speech, that speech is within the parameters of the *Giboney* exception.[22] Both posit the Uhuru 3's speech and association are actually "acts" under Section 951 since it was allegedly done at the direction of a foreign government.[23] And while the Government argues "the charges do *not* turn on the content of Defendants' pro-Russian speech[,]" the Government's pleadings are replete with evidence of the opposite.[24] The evidence relied upon largely consists of protected First Amendment activities, including newspaper articles and speeches, inherently contradicting the Government's argument.  OA Nos. 11-12, 19-26, 30, 56, 68-70, 71, 75.

This Government's circular argument shows how *Giboney* has been used "as a tool for avoiding serious First Amendment analysis–a way to uphold speech restrictions as supposedly fitting within an established exception, without a real explanation".[25] The Government argues the content of the Uhuru 3's speech is irrelevant yet simultaneously evidence of guilt.  This argument conveniently

---

[22] ECF No. 157, pp. 8-9 (relying on *R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992) and *Rumsfeld v. FAIR*, 547 U.S. 47, 62 (2006) (relying on *Giboney*); ECF No. 172 (relying on *Giboney* to argue " [t]his prosecution is not content-based merely because certain overt acts refer to speech or other First Amendment protected activity").

[23] ECF No. 157, p. 7 ("Defendants' newspaper publications and attendance at conferences surpass merely speech when done at the direction or control of a foreign government, and thus, this prosecution falls under the purview of Section 951."); pp. 9-13.

[24] ECF No. 172 (emphasis in original).

[25] Volokh, *supra*, note 21, 988.

9

ignores that the Uhuru 3's political speech is purportedly integral to criminal conduct only because that is the Government's interpretation of Section 951.[26] The Government's argument relies on conflating the Uhuru 3's protected speech and expression with conduct, so the *Giboney* exception is inapplicable. Further, the Government's attempted reliance on the *Giboney* exception concedes that strict scrutiny is the proper standard.[27]

The last time the Government attempted to conflate speech with conduct, the Supreme Court disagreed, and determined strict scrutiny was the appropriate standard. *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2724 (2010). In that case, the statute prohibited "material support" to designated "foreign terrorist organizations".[28] "Material support" was defined to include speech. The plaintiffs, who sought to advocate for human rights and peace through non-violent communication and education, argued "that their right to free expression had been violated because they were not able to provide legal training and advocacy advice to groups that had been classified as foreign terrorist organizations by the

---

[26] ECF No. 157 ("From the bare language of the statute, Section 951 only targets action or conduct. The statute does not mention speech at all, much less make note of any content."); ("The content of the directed conduct or action is simply immaterial for the purposes of prosecution under Section 951.")

[27] This exception represents a *narrowly limited* exception to the general rule that content-based restrictions on speech must satisfy strict scrutiny. *Stevens*, 559 U.S. at 468-69 (quoting *Chaplinsky*, 315 U.S. at 571-72); *see also United States v. Alvarez*, 567 U.S. 709, 717-18 (2012).

[28] 18 U.S.C. § 2339B(a)(1) (2006).

Secretary of State."[29] The Government argued "the only thing truly at issue in [that] litigation is conduct, not speech" because the law was "directed at the fact of plaintiffs' interaction with" the foreign entity and "only incidentally burden[ed] their expression." *Holder*, 130 S. Ct. at 2723. The Supreme Court disagreed. Since the statute punished plaintiffs' speech and specifically included their communications with certain groups, the Court determined the regulation was content based, thereby triggering strict scrutiny. *Id.* at 2724.

The Government attempts this same argument here. It labels the Uhuru 3's protected speech and expression as "conduct" under Section 951 just as the Government argued in *Holder* when it labeled plaintiffs' speech as "material support". The Government's preferred reading of Section 951 would criminalize core First Amendment activity. "[E]xpression of dissatisfaction with the policies of this country" is "expression situated at the core of our First Amendment values." *Texas v. Johnson*, 491 U.S. 397, 411 (1989). Indeed, "there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs." *First Nat 'l Bank v. Belloti*, 435 U.S. 765, 776-77 (1978) (alteration in original). This protection extends to discussion of "politics, nationalism, religion, or other matters of opinion." *W Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). It also protects the "freedom to engage in

---

[29] Diahann DaSilva, *Playing A "Labeling Game": Classifying Expression As Conduct As A Means of Circumventing First Amendment Analysis*, 56 B.C. L. Rev. 767, 777 (2015).

11

association for the advancement of beliefs and ideas." *NAACP v. Patterson*, 357 U.S. 449, 460 (1958).

Consider the Magistrate Judge's hypothetical: "if Defendants were to publish articles about Russian literature and cuisine at the direction or control of the Russian government, then such conduct would indeed fall within the prosecutorial scope of Section 951." The harm allegedly occurring would stem from the Uhuru 3's protected expression, *i.e.*, the publishing of the articles. The "broad scope" of the First Amendment "embraces the right to distribute literature, *Lovel v. Griffin*, 303 U.S. 444, 452, 58 S. Ct. 666, 669, 82 L.Ed. 949, and necessarily protects the right to receive it." *Martin v. City of Struthers, Ohio*, 319 U.S. 141, 143 (1943) (citation in original). Prosecuting speech the Government deems politically unpopular directly contradicts the First Amendment as it is meant to prevent the government from "suppress[ing] unpopular ideas or information." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994).

The Government's prosecution of the Uhuru 3 relies on conflating their protected speech and expression as conduct under Section 951 and is in direct contradiction with the First Amendment.

**B. Claims of National Security do not Lessen the Government's Burden.**

Invoking claims of "national security" does not destroy First Amendment protections or lessen the required Government's burden. The Government's burden to justify a First Amendment infringement is the same in the national

12

security context as in any other.[30]  Much of the Government's claims are based on the Uhuru 3's "core political speech" or their speech on "matters of public concern." OA Nos. 11-12, 19-26, 30, 56, 68-70, 71, 75. These particular categories of speech have rightfully had an elevated protection due to their unique, paramount importance.[31]  "The history of censorship in the United States has shown that security concerns are often cited to defend censorship and political repression. If such incantations were sufficient to trigger judicial deference to restrictions on speech and association, political freedoms would be gravely at risk." [32]

Meaningful judicial review is of particular importance when the Government claims national security concerns exist.  Alleged national security claims by the Government demand critical examination by the Courts: not automatic deference to the Government's position.  To avoid the risk of national security being used as a pretext to violate the constitutional rights of American citizens, courts must [fulfill] their "time-honored and constitutionally mandated

---

[30] *See, e.g.*, *N.Y. Times Co. v. United States ("Pentagon Papers")*, 403 U.S. 713, 729-730 (1971).  "The word 'security' […] should not be invoked to abrogate the fundamental law embodied in the First Amendment." *Pentagon Papers*, 403 U.S. at 719 (Black, J., concurring). "And national-security concerns must not become a talisman used to ward off inconvenient claims—a 'label' used to 'cover a multitude of sins.'" *Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 523, (1985)).

[31] *See, e.g., R.A.V.*, 505 U.S. at 422 ("Our First Amendment decisions have created a rough hierarchy in the constitutional protection of speech. Core political speech occupies the highest, most protected position….") (Stevens, White and Blackmun, JJ., concurring); *F.C.C. v. League of Women Voters*, 468 U.S. 364, 381 (1984) ("Expression on public issues has always rested on the highest rung of the hierarchy of First Amendment values.") (quoting *Carey v. Brown*, 447 U.S. 455, 466–67).

[32] David Cole, *The First Amendment's Borders: The Place of Holder v. Humanitarian Law Project in First Amendment Doctrine*, 6 Harv. L. & Pol'y Rev. 147 (2012).

13

roles of reviewing and resolving claims" alleging violations of civil liberties. *Hamdi v. Rumsfeld*, 542 U.S. 507, 535 (2004). "History teaches us how easily the spectre of a threat to 'national security' may be used to justify a wide variety of repressive government actions." *In re Washington Post Co.*, 807 F.2d 383, 391-92 (4th Cir. 1986). "The danger to political dissent is acute where the Government attempts to act under so vague a concept as the power to protect 'domestic security.' Given the difficulty of defining the domestic security interest, the danger of abuse in acting to protect that interest becomes apparent." *Forsyth*, 472 U.S. at 523 (quoting *U.S. v. U.S. Dist. Ct. for E. Dist. Of Mich., S. Div.*, 407 U.S. 297, 314 (1972)).

## CONCLUSION

For the foregoing reasons, *Amici* respectfully requests that this Honorable Court give careful consideration to the arguments presented and grant relief consistent therewith.

Respectfully submitted,

Juliana Cortes
9336 Cerulean Drive
Riverview, FL 33578
raguilar.law@gmail.com
cortes.yuyu@gmail.com
*Counsel for Amicus Curiae*
*National Lawyers Guild – Chicago Chapter*

Dated: August 16, 2024

14