**Summary of Anticipated Testimony**

Aaron Maté

CASE NO. 8:22-cr-259-WFJ-AEP

I will comment on the following items:

## Alleged 2016 Russian election interference

Both government expert witnesses, Thomas Rid and Bruce D. Taylor, assert as fact that Russia engaged in a significant interference effort in the 2016 US presidential election. In Taylor's words, Russia engaged in a "well-known and documented... effort to interfere in the 2016 US presidential election," which included "social media campaigns and a successful effort to hack into the email of the Democratic National Committee and other Democratic officials."

While this allegation is well-known, it is not well-documented. In fact, the available evidence undermines it.

The Russian interference allegation was officially lodged by the US government in a January 2017 Intelligence Community Assessment (ICA). The ICA asserted with "high confidence" that Russia conducted an "influence campaign in 2016 aimed at the US presidential election." Russia's goal, the ICA claimed, was to hurt Hillary Clinton and help elect Donald Trump, all while undermining "public faith in the US democratic process."

Yet contrary to widespread claims that the ICA represented the consensus of all US intelligence agencies, the ICA was closely managed by CIA Director John Brennan, who excluded several key entities, including the Pentagon and State Department. Moreover, far from being a vetted, consensus-based intelligence product, the ICA was in fact "drafted by CIA analysts" working directly under Brennan, who merely "coordinated with the NSA and the FBI," a House Intelligence Committee investigation later found. The House also determined that the ICA suffered from "significant intelligence tradecraft failings."

In an overlooked disclaimer, the ICA acknowledged that it lacked concrete evidence for its claims: "Judgments are not intended to imply that we have proof that shows something to be a fact. Assessments are based on collected information, which is often incomplete or fragmentary, as well as logic, argumentation and precedents. ... High confidence in a judgment does not imply that the assessment is a fact or a certainty; such judgments might be wrong."

When looking at the facts adduced to support the two central components of the alleged Russian interference campaign – social media campaigns and DNC email hacking – they collapse under scrutiny.

When it comes to the evidence that Russia hacked the DNC and released its stolen emails via Wikileaks, U.S. intelligence officials relied on the forensics of CrowdStrike, a private contractor for the DNC and Clinton campaign that was not a neutral party, much as "Russian dossier" compiler Christopher Steele, also a DNC/Clinton contractor, was not a neutral party.

The government allowed CrowdStrike and the Democratic Party's legal counsel to submit redacted records, meaning CrowdStrike and not the government decided what could be revealed or not regarding evidence of hacking.

In December 2017 testimony that was only publicly released in May 2020, CrowdStrike executive Shawn Henry admitted that his firm in fact "did not have concrete evidence" of Russian hacking.

As for the allegation that Russia waged a social media campaign to manipulate Americans in 2016, this too collapses under scrutiny.

The final report from Special Counsel Robert Mueller, which investigated allegations of Russian election interference, does not directly attribute Russia's alleged social media influence campaign to the Russian government, and makes only the barest attempt to imply a Kremlin connection. According to Mueller, the social media "form of Russian election influence came principally from the Internet Research Agency, LLC (IRA), a Russian organization funded by Yevgeniy Viktorovich Prigozhin and companies he controlled." While Prigozhin, who is now deceased, had close ties to the Russian government, Mueller found no evidence that his company's social media activity was directed by the Kremlin.

Further, in a [July 2019 ruling](), a federal judge rebuked Mueller and the Justice Department for suggesting that the IRA's social media activities "were undertaken on behalf of, if not at the direction of, the Russian government." U.S. District Judge Dabney Friedrich said Mueller's February 2018 indictment of IRA staffers "does not link the [IRA] to the Russian government" and alleges "only private conduct by private actors."

Even putting aside the complete absence of a Kremlin role, the case that the Russian government sought to influence the U.S. election via a social media campaign is hard to grasp given how minuscule it was. Mueller says the IRA spent $100,000 between 2015 and 2017.  Of that, just $46,000 was spent on Russian-linked Facebook ads before the 2016 election. That amounts to about 0.05% of the $81 million spent on Facebook ads by the Clinton and Trump campaigns combined -- which is itself a tiny fraction of the estimated $2 billion spent by the candidates and their supporting PACS.

Then there is the fact that so little of this supposed election interference campaign content actually concerned the election. Mueller himself cites a review by Twitter of tweets from "accounts associated with the IRA" in the 10 weeks before the 2016 election, which found that "approximately 8.4%... were election-related." This tracks with a report commissioned by the U.S. Senate that found that "explicitly political content was a small percentage" of the content attributed to the IRA. The IRA's posts "were minimally about the candidates," with "roughly 6% of tweets, 18% of Instagram posts, and 7% of Facebook posts" having "mentioned Trump or Clinton by name."

Mueller circumvents this with what sound like impressive figures:

*IRA-controlled Twitter accounts separately had tens of thousands of followers, including multiple U.S. political figures who retweeted IRA-created content. In November 2017, a Facebook representative testified that Facebook had identified 470 IRA-controlled Facebook accounts that collectively made 80,000 posts between January 2015 and August 2017. Facebook estimated the IRA reached as many as 126 million persons through its Facebook accounts. In January 2018, Twitter announced that it had identified 3,814 IRA-controlled Twitter accounts and notified approximately 1.4 million people Twitter believed may have been in contact with an IRA-controlled account.*

Upon scrutiny, Mueller's figures are exaggerated, to say the least. Take Mueller's claim that Russian posts reached "as many as 126 million" Facebook users. That figure is in fact a spin on Facebook's own guess, as articulated by Facebook general counsel Colin Stretch's congressional testimony in October 2017. "Our best estimate," Stretch told lawmakers, "is that approximately 126 million people may have been served content from a page associated with the IRA at some point during the two-year period." And the "two-year period" extends far beyond the 2016 election, to August 2017. Overall, Stretch added, posts from suspected Russian accounts showing up in Facebook's News Feed comprised "approximately 1 out of [every] 23,000 pieces of content."

Yet another reason to question the Russian operation's sophistication is the quality of its content. The IRA's most shared pre-election Facebook post was a cartoon of a gun-wielding Yosemite Sam. On Instagram, the best-received image urged users to give it a "Like" if they believe in Jesus. The top IRA post on Facebook before the election that mentioned Hillary Clinton was a conspiratorial screed about voter fraud. Another ad featured Jesus consoling a dejected young man by telling him: "Struggling with the addiction to masturbation? Reach out to me and we will beat it together."

Mueller also reports that the IRA successfully organized "dozens" of rallies "while posing as U.S. grassroots activists." Sounds impressive, but the most successful effort appears to have been in Houston, where Russian trolls allegedly organized dueling rallies pitting a dozen white supremacists against several dozen counter-protesters outside an Islamic center. Elsewhere, the IRA had underwhelming results, according to media reports: At several rallies in Florida "it's unclear if anyone attended," the Daily Beast later noted; "no people showed up to at least one," and "ragtag groups" showed up at others, the Washington Post reported, including one where video footage captured a crowd of eight people.

Far from exposing a sophisticated propaganda campaign, the reports suggest that Russian troll farm workers engaged in futile efforts to spark contentious rallies in a handful of states. When it comes to the ads, they may have been engaging in clickbait capitalism: targeting unique demographics like African Americans or evangelicals in a bid to attract large audiences for commercial purposes. Reporters who have profiled the IRA have commonly described it as "a social media marketing campaign." Mueller's February 2018 indictment of the IRA disclosed that it sold "promotions and advertisements" on its pages that generally sold in the $25-$50 range. "This strategy," a Senate report from Oxford University's Computational Propaganda Project observes, "is not an invention for politics and foreign intrigue, it is consistent with techniques used in digital marketing."

That, in fact, was Facebook's initial conclusion. As the Washington Post first reported, Facebook's initial review of Russian social media activity in late 2016 and early 2017 found that the troll farm's pages "had clear financial motives, which suggested that they weren't working for a foreign government." That view only changed, the Post added, after "aides to Hillary Clinton and Obama" developed "theories" to help them "explain what they saw as an unnatural turn of events" in their loss of the 2016 election. Among these theories: "Russian operatives who were directed by the Kremlin to support Trump may have taken advantage of Facebook and other social media platforms to direct their messages to American voters in key demographic areas."

In other words, the actual interference campaign in the 2016 election was that which sought to convince Americans that Russia waged one.

## Censorship of Criticism of US Foreign Policy

I will discuss efforts by government actors and affiliated entities to silence criticism of US foreign policy, particularly with the war in Ukraine. I have personal experience with this.

In June 2023, I revealed, based on [leaked documents from Twitter (now X),](#) that the Federal Bureau of Investigation has aided a Ukrainian intelligence effort to censor social media users and obtain their personal information.

In March 2022, an FBI Special Agent sent Twitter a list of accounts on behalf of the Security Service of Ukraine (SBU), Ukraine's main intelligence agency. The accounts, the FBI wrote, "are suspected by the SBU in spreading fear and disinformation." In an attached memo, the SBU asked Twitter to remove the accounts and hand over their user data.

The Ukrainian government's FBI-enabled targets extend to members of the media. The SBU list that the FBI provided to Twitter included my name and Twitter profile. In its response to the FBI, Twitter agreed to review the accounts for "inauthenticity" but raised concerns about the inclusion of me and other "American and Canadian journalists."

The listed Twitter profiles, the SBU alleged, have been "used to disseminate disinformation and fake news to inaccurately reflect events in Ukraine, justify war crimes of the Russian authorities on the territory of the Ukrainian state in violation of international law."

In order "to stop Russian aggression on the information front," the SBU continued, "we kindly ask you to take urgent measures to block these Twitter accounts and provide us with user data specified during registration."

The SBU expressed its "gratitude for the existing level of interaction."

If granted, the users on the list would not only have been banned from Twitter but had their phone number, date of birth, and email address disclosed to both the FBI and SBU.

The disclosure of a collaboration on censorship between the FBI and SBU is one of several documented instances of Ukrainian state-tied attempts to target foreign voices. A Ukrainian website known as Myrotvorets maintains a list of what it calls "enemies of Ukraine." I was [added to that list](#) along with any others, including American citizens. The Myrotvorets database was co-founded by Anton Gerashchenko, former deputy minister at the Ukraine's Ministry of Internal Affairs, where he now serves as an advisor.

The FBI's work with Ukrainian intelligence to censor Twitter users also follows [reporting from journalist Lee Fang](#) that the FBI has pressured Facebook to remove accounts and posts deemed by the SBU to be Russian "disinformation." According to Fang, a senior Ukrainian official in regular contact with the FBI defined "disinformation" in such broad terms that it could mean viewpoints that "simply contradict the Ukrainian government's narrative."