## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
|     Plaintiff, ) | |
| vs. ) | No. 8:22-cr-00259-WFJ-AEP |
| ) | |
| OMALI YESHITELA, ) | |
|     Defendant. ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL OR, ALTERNATIVELY, FOR A NEW TRIAL

Defendant Omali Yeshitela,[1] by and through his attorneys, respectfully submits the following memorandum of law in support of his renewed motion for a judgment of acquittal, or alternatively, for a new trial.

For the reasons set forth below and the reasons set forth in our prior Motion for Judgment of Acquittal (ECF No. 279), the government failed to prove that Defendants Penny Hess, Omali Yeshitela and Jesse Nevel knowingly and willfully agreed to act as agents of a foreign government without prior notification to the Attorney General. In the interest of justice this Court should enter a judgment of acquittal pursuant to Fed. R. Crim. P. 29, or in the alternative, grant a new trial pursuant to Fed. R. Crim. P. 33.

## I. INTRODUCTION.

On September 12, 2024, following trial, the jury entered a verdict finding Defendants Hess, Yeshitela and Nevel guilty of conspiracy to act as agents of Russia without prior notification to the Attorney General, as required by 18 U.S.C. § 951, in

---

[1] This Motion is filed on behalf of Defendant Hess although the arguments set forth apply equally to Defendants Yeshitela and Nevel.

violation of 18 U.S.C. § 371 (Count One of the Superseding Indictment), and not guilty of knowingly acting within the United States as an agent of Russia without prior notification to the Attorney General, in violation of 18 U.S.C. § 951 (Count Two of the Superseding Indictment).

## II.   RENEWED MOTION FOR JUDGMENT OF ACQUITTAL.

The Defendant will not repeat the arguments set forth in her prior Motion for Judgment of Acquittal. ECF No. 279. Instead, we seek to demonstrate the complete failure of proof on the essential elements of the conspiracy charge, with citations to the trial transcript.[2]

The conspiracy charge alleges that the APSP Defendants "did knowingly and willfully ... agree ... to act as an agent of ... the Russian Federation and officials of that government, without prior notification to the Attorney General." Superseding Indictment ¶25. The substantive crime underlying the conspiracy charge is 18 U.S.C. § 951, "Agents of foreign governments." Section 951 defines "agent of a foreign government" as "an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official." The Government presented zero evidence that Defendants Hess, Yeshitela or Nevel ever acted or agreed to act under the direction or control of any foreign master. The Government's three case agents each confirmed this fact at trial. Without such proof, the verdicts cannot stand.

_____

[2] All transcript cites are to a rough draft prepared by the court reporters. The final transcript

has not yet been prepared.

### The Trial Evidence

The evidence at trial was mostly undisputed. The government called no witnesses with direct knowledge of the Defendants' actions. Instead they relied on documents, electronic messages and audio and video recordings. Three case agents from the FBI (Agents Bowen, Meyer and Drupp) interpreted this evidence for the jury.

Defendants Hess, Yeshitela and Nevel are political activists and community organizers associated with the African People's Socialist Party (APSP). In May, 2015, Defendant Yeshitela was invited to speak at a conference in Moscow. The conference was hosted by Alexander Ionov, a Russian National who was president of the Anti-Globalization Movement of Russia (AGMR), a non-governmental organization (NGO). Following the May 2015 conference, Defendants entered into an alliance or a partnership with Ionov and his NGO in which they cooperated on certain political activism where their interests were aligned, mainly their opposition to western colonialism and militarism, and to police violence against African Americans. Tr. 9/5/24 PM, p.119, 131; GEX 275.

In July 2015, Ionov told Hess, by email, that the AGMR wanted to donate money to the "Uhuru movement" in a "public way." GEX 104E. In this email, Ionov stated that, in order to "transfer the collected funds to you," the AGMR needs detailed information about how the funds will be used "for our tax ministry." Ionov provided an example of the type of information required: "eg. We're donating this money to

5

Uhuru movement for performing a series of events. The funds will be used to print 100 flyers, 10 banners, renting of event place, etc." GEX 104E; Tr. 9/9/24 PM, pp. 34-36. Between July 2015 and February 2016, Ionov contributed about $8,500 to the APSP. Most of these funds – at least $7,000 – were a direct repayment of some of the APSP's out-of-pocket costs for its January 2016 four-city encampment tour which protested police violence against African Americans and demanded reparations. There were no financial contributions from Ionov, or requests for contributions, after February 2016. Tr. 9/9/24 PM, pp.122, 133.

The government also introduced reports indicating that at some point in time, most likely in 2017 or 2018, Ionov became a confidential informant for the FSB, a Russian intelligence agency. Ionov concealed this relationship from the Defendants. In his communications with the Defendants, Ionov and his associates repeatedly emphasized their genuine concern for African liberation and for the other core issues of the APSP. Tr. 9/4/24 PM, p.90; Tr. 9/9/24 PM, p.54.

### **Argument**

**A.**    The Government presented no evidence that Defendants Hess, Yeshitela or Nevel ever acted or agreed to act under the direction or control of Ionov or the AGMR, an essential element of the conspiracy charge; all three of the Government's Case Agents unambiguously conceded this point at trial.

Federal Rule of Criminal Procedure 33 provides that a court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P.

33(a). To grant a new trial, the court must find that evidence "preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *United States v. Gallardo*, 977 F.3d 1126, 1139-40 (11th Cir. 2020) (internal quotations omitted). When considering a new trial motion, the district court "may weigh the evidence and consider the credibility of the witnesses." *Id*. at 1140.

The evidence supporting the charge that Defendants agreed to act under direction or control of Ionov or any person connected to the Russian state is not just insufficient, it is nonexistent. The Government's three case agents each conceded that at no point in time did the Defendants act under the direction or control of Ionov or the AGMR.

Agent Bowen was the lead investigator on the case. Tr. 9/9/24 PM, p.110. Agent Bowen conceded that Ionov made requests or suggestions or offers to help the APSP relating to political actions which include the Overt Acts charged in the indictment. The APSP Defendants sometimes assented and sometimes refused. They were under no obligation to assent to these requests. On other occasions, Defendants made requests to Ionov, asking him to speak at a meeting or provide reports relating to international media.

Agent Bowen testified that in July 2015, Ionov made a "request," asking Hess and Yeshitela "what [they] think" about getting "multiple organization (worldwide)" to sign a statement acknowledging "ongoing genocide against black people in America." Bowen agreed that Ionov was "not directing [Hess] to file a petition" as

alleged in the indictment.[3] Tr. 9/9/24 PM, p.47.

In May 2015, Ionov asked Defendants, "is it possible to post" an article on the Burning Spear website. Tr. 9/9/24 PM pp.87-88. In July 2015, Ionov asked Hess if Yeshitela would sign a petition regarding the conflict in Ukraine. Agent Bowen agreed, "There's no indication that [Yeshitela was] under any obligation to sign this petition." Tr. 9/9/24 PM pp.49-53.

In March 2022, Ionov made "a request" to Yeshitela to organize a protest of Facebook censorship. Tr. 9/9/24 PM, p.97. Agent Bowen agreed that at no time did Ionov demand that the APSP Defendants take any action.

Q. There was never a demand for action by Alexander Ionov, was there?

A. He does request actions, yes.

Q. All right. And it's always, do you think it's possible, can you do this for us, would this be okay, that was the interaction between them?

A. Yes, that's the kind of language that's used.

Tr. 9/9/24 PM, p.127.

---

[3] Overt Act 5 in the Superseding Indictment alleges that "defendant IONOV caused electronic messages to be sent to defendant HESS directing HESS to draft a "petition on Genocide of African people in U.S."

Agent Bowen further agreed that the APSP Defendants sometimes refused Ionov's requests. In August 2015, Ionov asked Yeshitela to make a video about police

repression in America. Hess and Yeshitela refused the request. Tr. 9/9/24 PM, p.56. In December 2015, Ionov asked Hess if the APSP would "organize an action on the streets against Turkish aggression and their attack against the Russian plane." Hess replied that the APSP did "support Russia on this question," but she refused the request to organize an action. Tr. 9/9/24 PM, p.65. Agent Bowen was then asked: "So there appears to be no obligation, when a request is made, to say yes. Would you agree with that?" Bowen replied: "I would agree with that." Tr. 9/9/24 PM, p.66.

The Superseding Indictment alleges that the APSP advocated Russia's side in its conflict with Ukraine after receiving an email "URGENT MESSAGE" from Ionov on February 25, 2022. Superseding Indictment ¶66. But Agent Bowen conceded that the Defendants held a public event advocating a similar message on February 23, 2022, before they received any message from Ionov. Tr. 9/9/24 PM, p.127. Agent Bowen further conceded that the APSP Defendants have held consistent views on the conflict between Russia and Ukraine since at least 2014, before they met Ionov, and that their positions are "sincere and heartfelt."

> Q. Omali [Yershitela]'s position is that the war was provoked ... by actions of the United States ..., correct?
>
> A. Yes, I would say that's his position.
>
> Q. In fact, he's talked many, many times about the expansion of NATO towards Russia's border, correct?
>
> A. He's talked about it before, certainly before that.

Q. And the provocation that that will cause for Russia, correct?

A. Yes, he's talked about that before.

Q. And ... the arming of Ukraine and putting weapons on Russia's border, correct?

A. I'm sure he's mentioned that. I know that sounds consistent with the videos that I've reviewed, that that's his position on it.

Q. And he's also talked about the coup in 2014 where the [Ukrainian] president was replaced with a NATO and western friendly president, is that true, that you've heard Omali talk about that?

A. I do believe I heard him speak about that, yes.

Q. Is and you don't have any doubt that his views on this [are] sincere and heartfelt, correct?

A. No, I do not have a doubt about that.

Q. In fact, you would agree that he's held these positions about the danger of NATO expansion and provoking Russia for many, many years, correct?

A. Yes, I would agree with that.

Q. And he's held these positions before he ever met Alex Ionov; is that true?

A. I could say probably, yes, at least before 2014 maybe.

Tr. 9/9/24 PM, pp.94-95.

Agent Bowen further agreed that the evidence showed that the APSP Defendants were not willing to compromise their views for anyone, including Ionov. When the APSP Defendants published articles or advocated political beliefs, they did so because the action aligned with their beliefs. Tr. 9/9/24 PM, p.97. Thus, when the

10

APSP agreed to protest censorship at Facebook in March 2022, Agent Bowen agreed that these protests appear to be motivated by the Defendants' "heartfelt" belief that censorship is wrong. Tr. 9/9/24 PM, p. 103. Agent Bowen was asked directly:

> Q. "He [Yeshitela] doesn't appear to be somebody that's for sale, does he?"
>
> A. "No."

Tr. 9/9/24 PM, p.97.

The evidence showed that Ionov and his assistant repeatedly asked the APSP Defendants to adjust their position on whether African Americans should demand their own State within the United States. In August 2015, Hess explained to Ionov's assistant that the APSP believes that the U.S. land base was stolen from the Indigenous people and, therefore, the APSP does not support a separate State for black people in the U.S. on stolen land. Tr. 9/9/24 PM, p.58. In September 2015, Ionov told Hess that Yeshitela's invitation to speak at a September 2015 Dialogue of Nations Conference in Moscow was on the "condition" that he should talk about "creating a separate state." Hess and Yeshitela did not accept this condition. Instead, they sent Ionov a four-page document explaining that the APSP upholds "unconditional solidarity with the fact that the land base of the United States is the homeland of the Indigenous and Mexican people." Tr. 9/9/24 PM,  p. 64; GEX 102C3, p.3. Agent Bowen agreed that the APSP Defendants' position that they are not a separatist group was "heartfelt" and "not negotiable." Tr. 9/9/24 PM, p.97.

11

The other two case agents testifying at trial also confirmed that the APSP Defendants never acted or agreed to act under the direction or control of Ionov or his NGO. Agent Drupp testified that after Ionov demanded that Hess provide detailed information about the encampment tour, Yeshitela intervened and sent Ionov the following message:

> Uhuru! This is Chairman Omali Yeshitela. I understand what Alex is asking for, but I don't know what relationship that has with the promise you made to us about getting the money to us right away, within two days of our expenditures! ... it must be understood that we entered this relationship with the Anti Globalization Movement of Russia as ALLIES, not employees!

Tr. 9/4/24 PM, p.68; GEX 102E, p.25. Ionov did not dispute Yeshitela's description of their relationship. Then in a subsequent message, Yeshitela demanded that Ionov send a report detailing how he fulfilled his promise to the APSP to provide international media coverage for their protest. Tr. 9/4/24 PM, p.68.

Agent Meyers, who speaks Russian and reviewed Ionov's Russian language reports to his handler at the FSB, testified that Ionov admitted to his handler that he had no direction or control over Yeshitela or the APSP. In this report, Ionov described his relationship with the APSP as "a bilateral cooperation program." Agent Meyers explained Ionov's meaning: "It goes two ways ... It's a cooperation ... It's not I'm telling you what to do, it's we're working together." Tr. 9/5/24 PM, p. 119.

The government cannot dispute the testimony of its own case agents. Instead,

12

it attempted to conflate the meanings of being an agent of a Russian with being a partner with a Russian. It also pointed to certain messages from January 2016 demanding that Ms. Hess provide information about the encampment tour. However, in July 2015, Ionov advised the Defendants that his tax preparer required detailed information about Defendants' actions in order for Ionov to make financial donations. Tr. 9/9/24 PM, pp. 82, 126. It was thus undisputed that when Hess sent Ionov information about the encampment tour in January 2016, it was for the sole purpose of helping Ionov send the funds he had pledged to support the tour. Hess was not acting as Ionov's agent. There was no ambiguity about this evidence. And even if there had been, it was removed when Defendant Yeshitela intervened and reminded Ionov that, "we entered this relationship with the Anti Globalization Movement of Russia as ALLIES, not employees!" GEX 102E, p.25. Ionov's demands for information ceased after he received Yeshitela's message.

Accordingly, in no sense did the Defendants ever act or agree to act as agents of Russia. Without evidence to prove this element of the charge, a judgment of acquittal must be granted. All of the evidence showed that Defendants entered into a partnership or an alliance with Ionov in which they agreed to cooperate on areas of common interest and belief. When Ionov made a request or a suggestion, Defendants were free to accept or reject it. And in each instance that a proposal was accepted, it was because Defendants believed it advanced the core issues of the APSP. This

13

relationship was not a crime under 18 U.S.C. § 951.

The Constitution requires the government to prove guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 313–14 (1979). If a reasonable jury could not find guilt beyond a reasonable doubt, the court may not enter judgment on a guilty verdict. *See United States v. Grow*, 977 F.3d 1310, 1320 (11th Cir. 2020). A guilty verdict can be sustained only if the government introduces sufficient, credible and probative evidence that the defendant was guilty of each element of the offense on each of the charges. *Neder v. United States*, 527 U.S. 1, 15 (1999); *In re Winship*, 397 U.S. 358, 364 (1970). Failure to prove an essential element entitles a defendant to an acquittal. *Jones v. United States*, 526 U.S. 227 (1999).

B.  The concession by Case Agent Drupp that the Government possessed no evidence that Defendants had knowledge of their alleged requirement to register with the Attorney General as foreign agents created a fatal variance with the indictment and another reason why an acquittal must be granted on the conspiracy charge.

At trial, Agent Drupp was asked if there was any evidence that Defendants had knowledge of a requirement to register with the Attorney General:

Q. In the three years that you investigated this case and the numerous emails that you reviewed, Facebooks, and all the communications, did you ever see anything that indicated that any of the defendants knew that they were supposed to somehow register with the Attorney General's office?

A. No.

Tr. 9/4/24 PM, p.89.

14

However, the conspiracy charge in the indictment alleges a 'knowing and willful' failure to register. Count One alleges that the Defendants:

> did *knowingly and willfully combine, conspire*, and agree with each other and other persons, known and unknown to the Grand Jury, to commit an offense against the United States, that is, *to act as an agent of a foreign government* and foreign officials, to wit, the Russian Federation and officials of that government, *without prior notification to the Attorney General*, as required by law, in violation of 18 U.S.C. § 95l(a).

Superseding Indictment, ¶25.

The variance between the undisputed evidence and the crime charged in the indictment is fatal and demands that this Court grant an acquittal on the conspiracy charge. *See Berger v. United States*, 295 U.S. 78, 82 (1935). The Defendant could not have willfully conspired to act as a foreign agent without notification to the Attorney General if they were unaware of any requirement to notify.

### C.    The inconsistent verdicts provide further reason to enter a judgment of acquittal.

Typically, an inconsistency in a jury's verdict does not warrant setting it aside. *See, e.g.*, *Dunn v. United States*, 284 U.S. 390 (1932). Here, however,  the jury's acquittal on the substantive account served as an acquittal on the conspiracy count because the acquittal on the substantive count constituted a determination by the jury that there was no overt act in support of the conspiracy.

The Court instructed the jury that to find Defendants guilty of conspiracy, they must find beyond a reasonable doubt that "during the conspiracy, one of the

conspirators knowingly engaged in at least one overt act as described in the indictment." ECF No. 284, p. 11. Relevant to the APSP Defendants, the Superseding Indictment described the following overt acts: May 2015 Meeting in Moscow, 2015 United Nations Petition, September 2015 Dialogue of Nations Conference, 2016 Reparations Tour, Article Concerning Russian Olympic Team, 2017 St. Petersburg, Florida Election, International Committee for the Protection of Human Rights, 2019 St. Petersburg, Florida Election, 2020 Dialogue of Nations Conference, and 2022 Russian Invasion of Ukraine. ECF No. 12, pp. 13-30. These overt acts constituted substantive offenses charged in Count Two. As the jury acquitted the APSP Defendants on Count Two, it could not have found that they committed an overt act. Accordingly, the Court should grant a judgment of acquittal.

## III.    IN THE ALTERNATIVE, THIS COURT SHOULD GRANT A NEW TRIAL UNDER RULE 33.

A district court may grant a new trial based on the weight of the evidence in "really exceptional cases." *See United States v. Kincherlow*, 88 F.4th 897, 902 (11th Cir. 2023). The court may grant a new trial "in the rare case in which evidence of guilt although legally sufficient is thin and marked by uncertainties and discrepancies." *Id*. (internal quotation marks omitted). "[C]ourts have granted new trial motions based on weight of the evidence only where the credibility of the government's witnesses had been impeached and the government's case had been

marked by uncertainties and discrepancies." *United States v. Martinez*, 763 F.2d 1297, 1313 (11th Cir. 1985) (internal quotations omitted).

**A.** The Court's failure to instruct the jury that it must find the elements of the underlying crime – including an agreement to act under direction or control of Russia – to convict on the conspiracy, coupled with the Government's misleading closing argument where it told the jurors that it only needed to find evidence of a "partnership" to convict on the conspiracy charge, compels a new trial.

The instruction to the jury explaining the Count One conspiracy charge spans four pages and is not easy to comprehend. *See* Jury Instructions, pp. 11-14. During the jury instruction conference, the defense asked the Court to tell the jury that it must "find the elements of the 951 violation to find the conspiracy." Tr. 9/10/24, p.2. The Court agreed with the defense that the jurors "don't hear about the elements [until] 6 pages later." But the Government objected to putting the elements of Section 951 "in twice." Following the Government's suggestion, the Court included only a reminder that it would hear about the elements of the underlying crime later in the instructions.[4] The Court instructed the jury:

> The Government alleges that the object of the conspiracy was for the Defendants or their co-conspirators to act in the United States as an agent of a foreign government or officials without first notifying the Attorney General, in violation of federal law. The elements of this crime alleged to be the object of the conspiracy are set forth at pages 17-19. Please refer to those.

Jury Instructions, p.11.

Then in his closing argument, the prosecutor told the jury that it could convict

17

on the conspiracy charge if it found that Defendants had a "partnership" with Ionov. This was untrue. To convict on the conspiracy, the jury had to find that Defendants agreed to act under Ionov's direction or control. If the evidence showed that Defendants agreed to partner with Ionov, the jury was required to acquit.

Taking advantage of the lack of clarity in the conspiracy instruction that it helped foster, the prosecutor asked the jury to focus on the second paragraph which confusedly mentions the word "partnership."[5] The prosecutor argued to the jury:

---

[4] The Court instructed the jury:

"The Government alleges that the object of the conspiracy was for the Defendants or their co-conspirators to act in the United States as an agent of a foreign government or officials without first notifying the Attorney General, in violation of federal law. The elements of this crime alleged to be the object of the conspiracy are set forth at pages 17-19. Please refer to those."

[5] The second paragraph of the conspiracy instruction reads as follows: "A 'conspiracy' is an agreement by two or more people to commit an unlawful act. In other words, it is a kind of 'partnership' for criminal purposes. Every member of a conspiracy becomes the agent or partner of every other member." Jury Instructions, p.11.

Let's start with those first 2 elements, the agreement. It's at the heart of the conspiracy charge. As you'll be instructed by the Court, an agreement is a kind of partnership for criminal purposes. Every member of the conspiracy becomes the agent or partner of every other member. The object of the conspiracy in this case, to act as an agent of the Russian government or an official thereof without notification to the Attorney General.

Tr. 9/10/24, p.56.

Then the prosecutor reminded the jury that Defendant Yeshitela had described his relationship with the AGMR as an "alliance" and disingenuously used that innocent description as an admission of guilt.

Here's a message sent by Omali Yeshitela using Penny Hess' account in February 1st, 2016. Focus on the last sentence, because we've heard that a few times during trial. It must be understood that we enter this relationship with the Anti-Globalization Movement of Russia as allies, not employees. What's another word for allies? Partners. This was a partnership. As you'll be instructed, the conspiratorial agreement that we need to prove is a kind of partnership for criminal purposes.

Tr. 9/10/24, p.61.

The above argument was pure deception. Proof that Defendants entered an alliance or a partnership with Ionov required the jury to acquit. A non-governmental organization like the APSP is allowed to seek international allies and supporters, even if those allies are connected to foreign governments or foreign government officials. *See, e.g.*, *Non-Governmental Organizations (NGOs) in the United States: Fact Sheet*, U.S. Dep't of State (Jan. 20, 2021), https://www.state.gov/non-governmental-organizations-ngos-in-the-united-states/. Here, the Government told the jury to

19

convict based upon innocent evidence showing that Defendants committed no crime. In short, the Government misled the jury to obtain a wrongful conviction.

Prosecutorial arguments that misstate the law and are designed to produce wrongful convictions violate Due Process. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

> **B.**    The Court erred in refusing to instruct the jury that evidence offered against Defendant Romain in 2022 could not be considered against Defendants Hess, Yeshitela and Nevel where, in 2018, the APSP expelled Romain from their organization, in writing, and severed all ties and communication with Romain.

Defendant Romain was a member of the APSP until November 2018, when he was advised, in writing, that effective November 18th, 2018, "you have been expelled from the African People's Socialist ... pursuant to a unanimous vote by the National Central Committee of the African People's Socialist Party." DEX 25.

Agent Bowen conceded that after being expelled from the APSP in 2018, there were no further communications between the APSP Defendants and Mr. Romain.

Q. [In] 2018, there was a separation between the African People's Socialist Party and Mr. Romain, correct?

A. That's correct.

Q. And in fact there's a formal letter that was written to Mr. Romain saying he's terminated -- his services are no longer required at the African People's Socialist Party?

A. I believe there was a letter or some document saying he had been expelled from the party.

20

Q. He's been expelled?

A. Yes.

Q. And there's no more association between the party and Romain after that. They don't collaborate on issues, correct?

A. No.

Q. And with his Facebook protest, there was no discussion between African People's Party and Mr. Romain coordinating protest, correct?

A. That's true.

Tr. 9/9/24 PM, pp.100-01.

After leaving the APSP, Defendant Romain went on to form his own organization called the Black Hammer Movement. At trial, the Government presented evidence that, in 2022, Romain began doing political actions and protests at the apparent direction or control of Ionov.

After staging a protest against Facebook in March 2022, Defendant Romain sent the following message to Ionov: "That was fun. Who we attacking next?" Tr. 9/9/24 AM, p.39. In April 2022, Ionov told Romain in a message that he needed messages posted to social media attacking a woman who "promotes the Ukrainian agenda in American circles and also discredits the LGBT community in Russia." Romain responded: "I got you comrade. Let's nail this bitch to the wall. You know I love an attack mission." Tr. 9/9/24 AM, p.49. On May 6, 2022, Ionov asked Romain "to hold a rally at the CNN office and accuse them of becoming students of the fascist

21

Goebbels and propagandizing exclusively their own interests." Romain responded: "Hey comrade. I can do that easily. When do we need this done? ... Is there anything particular you think I should say in the video?" Tr. 9/9/24 AM, p.51-52.

The defense twice requested a limiting instruction advising the jury that evidence offered against Romain, following his expulsion in 2018 from the APSP, cannot be considered against the APSP Defendants, Yeshitela, Hess and Nevel. 9/6/24 AM, pp. 82-84; 9/6/24 PM, p. 122. The Court denied these requests. 9/6/24 AM, pp. 82-84; 9/6/24 PM, p. 122. There was no legal basis to refuse to give the limiting instruction. The APSP Defendants were clearly harmed by the Court's failure to properly instruct the jury not to consider evidence of Romain's conduct in 2022 against them. The evidence of Romain's conduct in 2022 was the only evidence presented during the entire trial of any defendant acting under the direction or control of Ionov. The overarching conspiracy charge unfairly directed the jury to consider evidence offered against one defendant against all defendants. But there was no evidence that the APSP Defendants ever joined any conspiracy to act under the direction or control of Ionov.

The Defendants were aligned with Romain at a time when there was no direction or control and thus no criminal act or conspiracy. Rather, there was a lawful partnership or alliance with a foreign national.

Whether or not the Defendants' 2018 letter expelling Romain from the APSP

22

satisfied the legal requirements of a withdrawal from a conspiracy is immaterial. There was no evidence of any criminal conspiracy in 2018. There was only evidence of a lawful alliance or partnership with a foreign friend.

Here, the evidence shows: (a) In 2015, APSP entered into a lawful partnership or alliance with Ionov. That partnership continued through to the spring of 2022; (b) Romain was a member of the APSP until 2018 when he was expelled from the group; (c) after his expulsion in 2018, there was no further contact between the APSP and Romain; (d) at some point after his expulsion, there is evidence that Romain entered into a criminal conspiracy with Ionov. There was no legal basis to find that APSP members are criminally liable for Romain's actions after he left their group based solely on their prior association with him.

Alternatively, the Court should have granted Defendants' Motion for Severance from Defendant Romain for the reasons set forth in that motion. ECF No. 199.

**C.** It was reversible error for the Government to introduce misleading, inflammatory and irrelevant evidence on re-direct examination of its case agent erroneously telling the jury that the Defendants agreed to build a "doxing" website with Russian support.

On cross-examination of Agent Bowen, the lead case agent, Defendant Hess introduced an audiotape from a January 15, 2016, meeting in which the APSP Defendants discussed Ionov's offer to help fund the encampment tour. This evidence directly refuted the allegation that Defendants were acting under the direction or control

of Ionov.[6] Defense counsel had given the Government prior notice of his intention to introduce this evidence on cross-examination.[7]

The January 15 meeting lasted about one hour and twenty-one minutes. Most of the discussion involved the encampment tour. But about ten minutes of the meeting was spent discussing an offer from Ionov to assist in building a website to "[publish] photos of all cops and judges and things like that who have killed ... harmed African people, including like the cop who threw the child in South Carolina." Exhibit A, Transcript of January 15, 2015 APSP meeting, at 2:09.[8] During this discussion, Defendant Yeshitela made clear that no decision had been made to

---

[6] Agent Bowen agreed that the discussion during the meeting showed the Defendants decided to go forward with the encampment tour, not because they were directed to do so, but because they believed it would advance their core mission of African liberation, because they could time the encampment protest to coincide with the United Nations working group's meetings in Chicago, and because Ionov's offer of financial support allowed them to hold a tent vigil which they otherwise might not be able to afford. Tr. 9/9/24 PM, pp.79-80.

[7] Defendant initially sought to introduce this evidence (DEX 18) earlier in the trial, during cross-examination of Case Agent Drupp, but Agent Drupp was not familiar with the recording. Tr. 9/4/24 PM, p.61.

[8] This transcript was prepared by Microsoft Word.

accept this offer or to build this website. 3:40 ("we would have to talk about its design if we think it's a good idea"); 11:31 ("we just talked about who could do what and what it should be called, but we haven't even agreed yet that this is a good idea to do it.").

Most importantly, as the Government was well aware, no such website was ever built or even attempted. Nor did the Defendants ever reach any agreement as to what information would appear on the website, had it been built.[9] The idea was briefly discussed at the January 15 meeting and then abandoned. But this is not what the jury was told.

Before playing any excerpts from the recording, the prosecutor advised the jury that the website was intended to dox and cause harm to individuals.

Q. Can you explain to the jury what doxing is?

DEFENSE COUNSEL: Objection. Outside the scope.

THE COURT: All right. Well, I haven't -- go ahead.

AGENT BOWEN: Doxing is when someone puts personal information about another individual online so that -- like their address, name and address, something like that.

---

[9] It is suggested in the meeting that the website could improve upon a database that the FBI "was supposedly involved in creating some kind of data thing that will finally begin to calculate the numbers of police shootings out throughout the country." 4:03.

Q. And what's the purpose of that?

A. So that, you know, harm could come to them potentially.

The prosecutor then used leading questions to falsely convey to the jury that

the Defendants had agreed to build a doxing website with Ionov's assistance.

Q. And in that meeting, did they discuss a plan to work on a doxing website with the Russians?

A. Yes.

***

Q. So when Yeshitela is referring to support to build this doxing website, whose support is he referring to?

DEFENSE COUNSEL: Objection. Mischaracterization of the evidence, best evidence. I don't see any reference to doxing anywhere.

THE COURT: Overruled. Go ahead... Well, he didn't actually say that term, so sustained. So rephrase your question.

Q. When he refers to building this website containing personal information of judges, police--

***

DEFENSE COUNSEL: Move to strike the prior testimony of the prosecutor.

THE COURT: All right. Overruled. Go ahead.

***

Q. And so *when Omali Yeshitela says that they're going to build* -- that they have support to build a website to publish the personal information for judges, police officer, and prosecutors, whose support is he referring to?

[Objection overruled]

A. He's referring to AGM support.

Tr. 9/9/24 PM, pp.141-43 (emphasis added).

The prosecutor's presentation of evidence designed to mislead the jury, attack the character of Defendants, and induce the jury to fear and loathe the Defendants, requires a new trial. As shown, the prosecutor directly told the jury, using leading questions, that the Defendants had agreed to build a doxing website for the purpose of causing harm to individuals. This was a gross mischaracterization of the evidence. Indeed, nowhere in the conversation did Defendants indicate that the purpose of the website was to harm prosecutors, law enforcement, or anyone else. Rather, the apparent purpose was to expose incidents of police misconduct.

Further, the Defendants' brief discussion of an offer to build a website that was never built or even attempted was irrelevant to any issue in the case. The indictment contains no mention of this website and the Government did not ask the Court to admit it under Rule 404(B) as other crime evidence. If the website discussion had any relevance, the Government could have introduced it on direct examination in a straightforward way. But instead, it chose to launch its character attack on re-direct examination of Agent Bowen, knowing that the Court did not allow re-cross- examination and that the Defendants would therefore have no chance to rebut or correct the record.

As the Supreme Court has held, "[A United States attorney] may prosecute with earnestness and vigor--indeed he should do so. But while he may strike hard blows, he is not at liberty to strike foul ones. It is ... his duty to refrain from improper methods calculated to produce a wrongful conviction." *Berger*, 295 U.S. at 88.

The United States Attorney in this case struck a foul blow, calculated to produce a wrongful conviction. He did so knowing that the government had failed to prove that the APSP Defendants ever acted under the direction or control of Russia, an essential element of both counts charged in the indictment.

The harm and prejudice to these Defendants cannot be overstated. During deliberations, the jury sent the following note to the Judge:

> The jurors are requesting that our personal information be sealed. This was a concern since day 1, however following testimony regarding "doxxing," we believe that this concern is valid and realized.

ECF No. 286.

There can be no doubt that the prosecutor's misleading presentation of irrelevant evidence produced the fear and contempt for the Defendants that was intended. A new trial should be granted in this case.

**D.** It was error for the Court to deny the Defendants' request to add one sentence to the elements instruction that would have made it clear to the jury that acting at the request or the behest of a foreign government is not a crime under 18 U.S.C. § 951.

It was error for the Court to fail to add the following sentence to the Count Two elements instructions as requested by Defendant: "It is not enough for [an individual] to simply be willing to do something the foreign principle requests." Tr., 9/10/24, pp. 13-14. This error was particularly prejudicial in light of the fact that the Court had mistakenly told the jury during voir dire that Defendants could be found guilty by acting at the request or behest of a foreign government.

Although the court has "broad discretion to formulate jury instructions," the instructions "as a whole" must "correctly appl[y] the law and state[] the facts."

*United States v. Anderson*, 326 F.3d 1319, 1329 (11th Cir. 2003). A reversal of a conviction is warranted where the jury instruction inaccurately presented the law or "the charge improperly guided the jury in such a substantial way as to violate due process." *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000) (internal quotations omitted).

Defendant's proposed sentence was a correct statement of the law. In *United States v. Rafiekian*, the Fourth Circuit explained "that a person [does not] become an 'agent' for the purposes of § 951 whenever he 'is willing to do something the foreign principal requests.'" 991 F.3d 529, 539 (4th Cir. 2021). The Department of Justice is in accord and explains that to be agent, the "circumstances must evince some level of power by the principal over the agent or some sense of obligation on the part of the agent to achieve the principal's request." *The Scope of Agency Under FARA*, Dep't of Justice , https://www.justice.gov/nsd-fara/page/file/1279836/dl.

Here, the elements instruction improperly guided the jury to find that a defendant could be found guilty if she or he was simply willing to do something at the foreign principle's request. Indeed, the instruction made it clear that "the relationship does not need to be that of an employer of the Defendant-a lesser degree of control is sufficient. A person who operates subject to a more hands-off form of direction would also be operating as an 'agent of a foreign government.'" The instruction, however, left the jury with the belief that mere willingness to do something at a foreign principle's request was sufficient to convict. The failure to provide the additional one sentence instruction was especially prejudicial, here, where the Court mistakenly

told the jury during voir dire that Defendants could be found guilty for acting at the behest or request of a foreign government.

As the failure to add Defendant's requested sentence to the elements instruction left the jury with the impression that it could find Defendants guilty based on their mere willingness to fulfill a foreign principle's request, the error was prejudicial and the Court should grant a new trial.

    **E.** **It was error to introduce hearsay statements of Popov, Sukhodolov, Vistoropskiy, and Mityagin, the alleged Russian co-conspirators, as there was no substantial, independent evidence that they were members of the alleged conspiracy or that their statements were made in furtherance of the alleged conspiracy.**

It was error to introduce the alleged Russian co-conspirators conversations with Ionov as they were hearsay and there was no independent evidence of a conspiracy and no evidence that these statements were made in furtherance of a conspiracy.

Hearsay is inadmissible unless it falls under an exception or is deemed not hearsay under Federal Rule of Evidence 801(d). Rule 801(d)(2)(e) provides that a statement is not hearsay if it "is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." To be admissible under Rule 801(d)(2)(E), "the Government must first establish the following by a preponderance of the evidence: (1) that a conspiracy existed; (2) that the conspiracy included the declarant and the defendant against whom the statement is offered; and (3) that the statement to be introduced was made during the course and in furtherance of the conspiracy." *United States v. Dickerson*, 248 F.3d 1036, 1049 (11th Cir. 2001) (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)).

Here, the Court denied Defendant Hess's motion in limine to exclude co-conspirator statements and overruled Defendants' contemporaneous objections in that regard. Defendant reasserts her arguments made in her motion and contemporaneous objections, ECF No. 229, and will not reiterate them here.

In addition to those arguments, Defendant notes that these statements were also inadmissible to the extent that they did not further any conspiracy with the Defendants. One cannot enter a conspiracy with a government agent or informant "who aims to frustrate the conspiracy." *See United States v. Arbane*, 446 F.3d 1223 (11th Cir. 2006). Here, not only was Ionov an informant, but he also intended to frustrate the APSP Defendants' goals as indicated in a message to Popov that they were "ruining such an organization." Tr., 9-5-24 AM, p. 66. Moreover, as Defendant noted in her Motion, ECF No. 229, the handler reports and messages were full of false information. There was no evidence that Defendants had any interest in Ionov's false statements to his handlers. Moreover, there was no evidence that the APSP Defendants had an interest in any grant money that Ionov would potentially receive as a result of these false statements. Indeed, the APSP Defendants received no donations from Ionov during the time period in which he authored his reports and messages.

**F.**    It was error for the Court to refuse to replace the lone African-American juror with the alternate African-American juror.

The failure to replace the sole black juror with the sole black alternate warrants a new trial. The Supreme Court has held that "the State denies a black defendant equal

protection of the laws when it puts him on trial before a jury from which members of his race have been purposefully excluded." *Batson v. Kentucky*, 476 U.S. 79, 80 (1986). Moreover, under the Sixth and Fourteenth Amendments, a defendant has the right "to a petit jury selected from a fair cross section of the community." *Duren v. Missouri*, 439

U.S. 357, 359 (1979).

Here, the sole African-American juror failed to timely appear and the Court decided to replace her with an alternate. Noting that a cross-section of the community was particularly important to this case, Defendants asked that the African-American alternate juror replace the sole African-American juror. Tr. 9/9/24 AM, pp. 19-20. The Court declined Defendants' request and replaced the missing African-American juror with the first alternate. The failure to select the African-American juror to serve on the jury denied Defendants their rights to equal protection and to a jury selected from a representative cross section of the community. A new trial is warranted.

**G.** **The Court erred when it admitted the testimony of the governments' Russia experts as the jury did not need help from experts to understand that Ionov was serving as a confidential informant.**

It was error to admit testimony from the government's Russia experts. Expert testimony is admissible only when "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Here, the jury did not need help understanding that Ionov was serving as a confidential informant. The jurors could easily assess Ionov's status as an informant from the evidence introduced by the

government. Rather, the only effect of the Russia experts was to instill fear into the jury about a connection to the Russian government. As the Russia experts did not serve to help the jury understand the evidence and only prejudiced Defendants by instilling a fear of Russia, a new trial is warranted.

## CONCLUSION

For all the reasons stated above, we respectfully request that the Court enter an Order entering a judgment of acquittal on the Conspiracy charge. Alternatively, the Court should enter an Order granting a Respectfully submitted,

ADE A. GRIFFIN, ESQ.
Griffin Inskeep Law, LLC
224 Datura St, Suite 900
West Palm Beach, Florida 33401
ade@agtilaw.com
Pleadings: service@agtilaw.com
(561) 320-6006

**/s/ Ade A. Griffin, Esq.**
By: ADE GRIFFIN
Florida Bar No. 0771961

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the

foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

_**/s/ Ade A. Griffin, Esq.**_
By:  ADE GRIFFIN, ESQ
      Florida Bar No. 0771961