UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE NO. 8:22-cr-259-WFJ-AEP

OMALI YESHITELA,
        a/k/a "Joseph Waller,"
PENNY JOANNE HESS,
JESSE NEVEL,
        a/k/a "Jesse Nevelsky,"
AUGUST C. ROMAIN, JR.
        a/k/a "Gazi Kodzo"

**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANTS'
RENEWED MOTIONS FOR JUDGMENT OF ACQUITTAL
AND MOTIONS FOR A NEW TRIAL**

The United States opposes the Defendants' motions, brought pursuant to

Federal Rules of Criminal Procedure 29 and 33, for a judgment of acquittal and a new

trial (Doc. 304-305, 307-308).[1]   In early September 2024, a federal jury found the

Defendants guilty of conspiring, in violation of 18 U.S.C. § 371, to act as foreign agents

of the Russian government.   At trial, the evidence proved that the Defendants

knowingly entered into a conspiratorial agreement with Alexander Ionov and his front

organization, the Anti-Globalization Movement of Russia—which the Defendants

knew was an "instrument of [the] Russian government" focused on "carrying out its

own agenda – to utilize forces inside of the U.S. to sew [sic] division inside the U.S."

---

[1] The motions filed by Defendants Hess, Yeshitela, and Nevel are substantially similar and raise the same arguments.  When addressing those arguments, this opposition references Defendant Nevel's motion set forth at Doc. 308.

GX104M-1 at 2; GX104RR at 1.  This evidence, set forth in greater detail below, was more than sufficient to convict as a "reasonable trier of fact could conclude that the evidence established the defendant's guilt beyond a reasonable doubt." *United States v. Descent*, 292 F.3d 703, 706 (11th Cir. 2002) (citations omitted).  Because of the strength of this evidence, there is likewise no basis for a new trial—a "rare" remedy that is not warranted here. *Butcher v. United States*, 368 F.3d 1290, 1297 n. 4 (11th Cir. 2004).  For the reasons set forth below, the Court should deny the Defendants' motions in full.

## I.   BACKGROUND

On April 13, 2023, a grand jury returned a Superseding Indictment charging six Defendants—including Defendants Omali Yeshitela, Penny Joanne Hess, Jesse Nevel, and Augustus C. Romain, Jr.—with conspiring to act as unlawful foreign agents of the Russian Government.  Doc. 12.  Additionally, Defendants Yeshitela, Hess, and Nevel were also charged with acting as unlawful foreign agents of the Russian Government in violation of 18 U.S.C. § 951.  The Defendants pleaded not guilty and proceeded to trial.

Trial began on September 3, 2024 and the Government rested on September 10, 2024. Docs. 266, 280.  At the close of the Government's case-in-chief, the Defendants moved for a judgment of acquittal. Doc. 279.  The Court denied this motion. Doc. 280.  On June 26, 2024, a jury found the Defendants guilty as to Count 1 for conspiring, in violation of 18 U.S.C. § 371, to act as unlawful foreign agents.

After trial, the Defendants filed the instant motions for judgment of acquittal under Rule 29 and, in the alternative, for a new trial under Rule 33.  Docs. 304-305, 307-308.  The Defendants argue that "the government failed to prove that Defendants Penny Hess, Omali Yeshitela and Jesse Nevel knowingly and willfully agreed to act as agents of a foreign government without prior notification to the Attorney General."  Doc. 308 at 2.   Specifically, the Defendants raise four arguments in support of their Rule 29 motions for an acquittal, *id.* at 5-14, and seven additional arguments in support for their requests for a new trial, *id.* at 15-30.  Each argument is addressed in turn.

## II.   LEGAL BACKGROUND

### A.   Motion for Judgment of Acquittal Under Rule 29(c)

A post-trial motion for judgment of acquittal is governed by Federal Rule of Criminal Procedure 29(c).  "The sole ground for a post-trial motion under Rule 29(c) is that the evidence was insufficient to sustain a conviction."  *United States v. Miranda,* 425 F.3d 953, 962 (11th Cir. 2005) (citation and internal quotation marks omitted).  The jury's verdict must stand if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Mintmire*, 507 F.3d 1273, 1289 (11th Cir. 2007) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  The Court must draw all reasonable inferences and credibility assessments in the government's favor.  *Id*.  "This test applies regardless of whether the evidence is direct or circumstantial." *United States v. Williams*, 390 F.3d 1319, 1324 (11th Cir. 2004).

### B. Motion for New Trial Under Rule 33

Federal Rule of Criminal Procedure 33(a) provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "In doing so, the court 'may weigh the evidence and consider the credibility of the witnesses.'" *United States v. Witt*, 43 F.4th 1188, 1194 (11th Cir. 2022) (quoting *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985)). "But Rule 33 isn't an invitation for the court to 'reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable.'" *Id.* (quoting *Martinez*, 763 F.2d at 1312-13). For a new trial to be warranted, "[t]he evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Martinez*, 763 F.2d at 1313.

### III.   THE EVIDENCE PRESENTED AT TRIAL

On May 20, 2015, the Defendants—through their organization, the African People's Socialist Party or APSP—were invited by Russian national Alexander Ionov on an all-expenses paid trip to Russia.  GX104OO at 1; GX104NN.  The invitation was under the auspices of Ionov's supposed non-governmental organization, the Anti-Globalization Movement of Russia, or AGMR.  *Id.*  The express purpose of the trip was "to meet with [the Russians] and to communicate on future cooperation."  *Id.* The Defendants had their own goals for the trip: to "[e]stablish whatever kind of relationships we can make;" to "[c]ontribute to the encirclement of US imperialism (like Russia, Iran, etc.); to gain "access to media outlets to carry our news and

analysis;" and to "[m]eet with an official from the Russian Government formally." GX124G at 1-2.  Defendant Yeshitela traveled to Russia in May 2015 and met with Ionov.  GX103D.

In July 2015, Ionov and AGMR began making payments to the Defendants and APSP in exchange for APSP "performing a series of events."  GX104E at 1.  In the weeks that followed, Defendant Hess sent invoices to Ionov—which set forth the "prices for actions"—seeking payment.  GX106C.  Ionov made several payments to APSP later that month.  GX82.  By the end of July 2015, the Defendants had a "[d]eeping relationship overall" with the Russians, such that they were "in touch almost every day."  GX106J at 1.

At around that same time in July 2015, Ionov and AGMR for the first time instructed Defendant Hess to prepare a "UN petition on Genocide of African people in U.S."  GX123F at 2.  Ionov and AGMR specifically directed Hess that the petition "should be written ASAP," that it should be "sent to [the] UN office in New York," and that it should be posted publicly "to the websites of [the] White House and change.org."  GX102B at 25.  Defendant Hess responded, "I'm going to make that happen."  GX102C at 9.  Shortly thereafter, on September 5, 2015, the Defendants posted a genocide petition on Change.org, GX61, and Defendant Hess communicated to AGMR and Ionov that "the petition and a cover letter were sent to the Secretary General Ban Ki-Moon and to the entire General Assembly tonight electronically," GX102C at 60.

In the weeks that followed, Ionov and AGMR invited Defendant Yeshitela on a second all-expenses trip to Russia in September 2015. GX102C-1. The stated purpose of the trip was to attend the Dialogue of Nations Conference. *Id.* Yeshitela traveled to Russia and participated in the Conference. GX20A, 20B, 103G. As Yeshitela explained, even "[b]efore coming to Russia," he "assumed [that] the meeting was being convened by forces close to the Kremlin that was involved in mobilizing as many forces as possible in opposition to U.S. and European aggression." GX104J at 1. During the trip, the Defendants exchanged with one another several news articles that detailed Ionov and AGMR's close ties to the Russian government. GX76-77, 104M.

Upon returning to the United States from Russia, Yeshitela convened a meeting that included Hess and Nevel to provide a "Summation of [the] Russia Trip." GX104M at 1. The meeting was memorialized in writing by Defendant Nevel, who sent the Summation to the leaders of APSP, including Hess and Yeshitela. According to Yeshitela, the "Russian trip was important" and "more eventful than one might have initially thought it would be." *Id.* The conference, Yeshitela explained, was part of the "Russians pulling together forces through the world to function as an ideological and political opponent to the U.S." *Id.* At this meeting, Yeshitela informed Hess and Nevel that the "Anti-Globalization Movement of Russia is a solid institution of Russian politic," and that "it is clear that it is [an] instrument of Russian government." *Id.* at 2. And, Yeshitela made clear, "that does not disturb us." *Id.* In terms of APSP's future relationship with Russia, Yeshitela stated that Ionov and AGMR had "said they

wanted to 'help." *Id.* In response, Yeshitela had made clear to Ionov that APSP is "not a charity group," and that "[APSP] has interests, Russia has interests, we recognize that and that is the basis for our relationship." *Id.*

Yeshitela's summation was sent to Defendants Hess, Nevel, and Romain. The cover email—sent from the Office of Chairman Omali Yeshitela—reinforced many of these same themes. As Yeshitela wrote:

> In attending the AGM conference, we did so recognizing that the Anti-Globalization Movement of Russia *(which more than likely represents a method by which the Russian Government is engaging the U.S. and Europe in serious struggle)* is carrying out it's own agenda – to utilize forces inside of the U.S. to sew [sic] division inside the U.S. Likewise, our Party is clear that we also have our agenda – to place the question of African self-determination on the world's agenda and to win international allies for our National Liberation Struggle.

GX104RR at 1 (emphasis in original).

The partnership between Ionov, the Russian government, and the Defendants was further crystallized in notes from an October 2015 meeting, wherein Hess suggested that they should "[b]ring Alex [Ionov] to St Pete to see the institutions . . . see that supporting this will contribute to [the Russians'] efforts to undermine influence of United States in contest that they are engaged in." GX154M at 3. As Hess explained, "[w]hat's motivating the Russians is their contest with U.S. imperialism," and APSP should "[l]everage the relationship with the Russians to build other things— to gear towards reparations . . . ." *Id.*

At the start of 2016, Ionov and AGMR directed the Defendants to stage "a tent camp" event tied "to the Africans Charge Genocide campaign." GX102E at 1; 104VV-1 at 1-2. According to the Defendants' internal meeting notes, the Russians

had proposed the idea, the Defendants had "support from the Russians" for the campaign, and the Russians would "fund the tents and other expenses."  GX104VV-1 at 1-2.  In a letter to AGMR, Defendant Hess thanked Ionov for his "leadership in envisioning such actions."  GX104T-1 at 1, 3.  And, in an after-action meeting, Yeshitela explained that they undertook the campaign because Ionov and AGMR "wanted to see a big mobilization around the genocide question."  GX106CC at 1.

In support of the "tent city" event, Ionov and AGMR prepared and sent the Defendants a "Guarantee Letter" promising to pay $12,000 to APSP "for organization of [a] four-city tour from 22 to 29 January, 2016."  GX160 at 23.  After the Defendants organized and carried out the tour in late-January 2016, Ionov leveraged the earlier promise to make additional demands of the Defendants and to extract additional information from them.  GX104AAA at 1.

In the midst of a payment dispute that followed, Yeshitela captured the nature of the Defendants' relationship with the Ionov and the Russian government: ". . . it must be understood that we entered this relationship with the Anti-Globalization Movement of Russia as ALLIES, not employees."  GX102E at 28.  Finally, in notes from a "Meeting to sum up the Encampment Tour," Yeshitela explained that the reasons APSP undertook the Encampment Tour was because they had "developed a relationship with forces in Russia who are involved in their own struggle with the US."  GX106CC at 1.  Yeshitela then summarized the give-and-take in their relationship with the Russians: "Now we are in process—Russians have to justify their getting

resources for this.  They want information to work with."  *Id.*  Ionov ultimately paid the Defendants and APSP at least $7,000 in support of the protest tour.  GX88 at 1.

Throughout 2016, Ionov and AGMR repeatedly requested the Defendants to draft and publish articles on topics dictated by the Russians—and with perspectives favorable to the Russians.  For example, in May 2016, AGMR tasked Defendant Hess with publishing articles on Russian citizens who, according to Ionov and AGMR, were "illegally detained in the U.S.!!"  *See* GX104CCC (sending Hess articles, including about convicted-arms trafficker Viktor Bout).  Similarly, shortly after Russian Olympic athletes were banned for doping, Ionov and AGMR tasked the Defendants with making a statement "in support of [the] Russian olympic team and Thomas Bach, the President of IOC who advocated [for] the admission of Russian athletes to Rio Olympics," and asked if "this statement [can] appear on your website or FB page?"  GX102F at 1.  The Defendants routinely complied.  *See, e.g.*, GX104BB at 1; GX52 at 1.

In May of 2020, Defendant Yeshitela received a "request from Russia," which required Yeshitela and APSP to "record a short video" recognizing the sixth anniversary of the Donetsk People's Republic—a Russia-backed separatist organization operating in Eastern Ukraine.  GX104GG at 1; GX104HH at 1.  Again, the Defendants complied.  *See* GX251 (video message featuring Yeshitela).  In turn, Ionov prepared and submitted a report to his handlers in the Russian government—specifically, the FSB, the leading Russian intelligence service—about Yeshitela's

video.  *See* GX266 at 1 (explaining that the videos were "broadcast on outdoor screens in the center of Donetsk").

In February 2022, Ionov's focus—as evidenced in his communications with this FSB handlers—was on Russia's recent invasion of Ukraine.   GX324 at 1-2.  Specifically, Ionov complained to FSB Officer Aleksey Sukhodolov that the Russian government had "lost the whole information campaign!"  *Id.*  FSB Officer Sukhodolov responded with an instruction: "Join in."   And that's what Ionov did—holding "emergency phone talks" with organizations in the United States, including Defendant Nevel and APSP. GX111O at 1.  In a subsequent phone call with Yeshitela, Ionov requested that Yeshitela and APSP "support Russia in the information war unleashed by the West."  GX320 at 1.  In the weeks that followed, the Defendants hosted several video conferences featuring Ionov that pushed pro-Russian perspectives on the war.  *See* GX330A (March 13 conference); GX109F (March 20 conference).  At the same time, Ionov also directed Yeshitela to "make an official statement on the situation and show support for Russia," which Yeshitela did.  GX320 at 1.  Ionov prepared and submitted reports on this activity to his Russian government handlers at the FSB.  GX 319; GX320 at 1.

In the weeks after Russia's invasion into Ukraine, Ionov leveraged his partnerships with Defendant Romain and Defendant Yeshitela to have each of them use their organizations to stage protests at the U.S. company, Meta.  The purpose of the protest was to "end" alleged censorship by Meta and Facebook of Russia.  GX113; GX186 at 24.

With respect to Romain and Romain's Atlanta-based organization Black Hammer, Ionov paid for the protestors' travel, their accommodations, and even created the signs they used at the protest.  GX186 at 1,8, 15; GX 185B.  Romain and Black Hammer carried out the protest, GX185J, and sent video footage back to Ionov, who promoted the event to Russian media organizations, GX186 at 44, and reported back on the activity to his handlers with the Russian government, GX321 at 3.

As to APSP, Ionov held a video call with Yeshitela wherein Ionov directed him to use APSP to organize the protest at Meta and to do it as soon as possible.  GX115.  In that call, Ionov directed the nature of the action (i.e., protest at Meta), the content (i.e., alleged censorship of Russia), and the timing.  *Id.*  Immediately following that call, Yeshitela called an "urgent meeting" with APSP leadership, including Defendant Hess, to begin organizing the protest.  GX116.  Hess and the other APSP leaders supported the plan and carried it out.  GX114.

From May through July 2022, Ionov tasked and directed Romain to use the Black Hammer organization to stage protests at CNN to mark Russia's Victory Day celebration, GX 191 at 34, and at the Georgia State Capitol to oppose the provision of aid to Ukraine, *id.* at 71-72.  Romain carried out both directives.  *See* GX190A (video of CNN protest); GX 66 (news article on Georgia State Capitol protest).  During the Georgia State Capitol protest, Romain recorded a video of himself stating: "I am not ashamed to say that the Black Hammer Party has relationships with the Kremlin." GX37 at 28:11.

11

Between May 2015 and July 2022—the period during which the conspiracy was ongoing—none of the Defendants notified the Attorney General of the United States that they were acting as foreign agents of the Russian government, as they were required to do under federal law.  *See* GX30 (certification from FARA Unit confirming no notifications were made to the Attorney General under Section 951).

## IV.   ARGUMENT

### A. The Rule 29(c) Motion Should Be Denied.

Collectively, the Defendants raise four arguments in support of their Rule 29 motion.  Each argument fails and should be rejected.

<u>First</u>, the Defendants argue that evidence proving that the "Defendants agreed to act under direction or control of Ionov or any person connected to the Russian state is not just insufficient, it is nonexistent."  Doc. 308 at 6.  As a result, the Defendants contend that they must be acquitted of the conspiracy charge.  This is wrong and ignores voluminous evidence establishing that the Defendants (1) knew Ionov was working on behalf of the Russian government, and (2) agreed to partner with him to carry out acts in the United States.

Prior to returning the guilty verdict, the Court instructed the jury as to the elements of the conspiracy charged in Count 1.  Doc. 284.  Element 1 required the United States to prove that the Defendants "in some way agreed to try to accomplish a shared and unlawful plan."  *Id.* at 12.  The Court further instructed that a "conspiracy is an agreement by two or more people to commit an unlawful act," and that it is "a

12

kind of 'partnership' for criminal purposes," wherein "[e]very member of a conspiracy becomes the agent or partner of every other member." *Id.* at 11.

The following evidence was presented at trial to establish that the Defendants entered into an "agreement" to act as agents of the Russian government:

- Communications from May 20, 2015, wherein Ionov invited Yeshitela to travel to Russia for the purpose of "coming to meet with us and to communicate on future cooperation," GX104OO at 1;

- Internal notes from the Defendants setting forth their "goals for this trip to Russia," including to meet with a Russian government official and to establish whatever relationships they could, GX124G at 1-2, and electronic messages communicating the request to meet with a Russian government official to Ionov, GX123A at 4;

- Emails and other documents from July 2015 wherein (1) Ionov and AGMR offered to make payments to the Defendants in exchange for "performing a series of events," (2) the Defendants subsequently sent invoices to Ionov with the subject line "prices for actions," (3) Ionov then made these payments, and (4) the Defendants carried out actions, GX 104E, GX2;

- A document dated July 25, 2015 with the header "Relationship with the Russian forces since the trip to Russia," wherein the Defendants stated that they have a "deepening relationship overall—in touch almost every day," GX106J;

- A document summarizing Yeshitela's September 2015 trip to Russia wherein he describes the partnership between APSP and the Russians: "we have interests, Russia has interests, we recognize that and that is the basis for our relationship," GX104M-1 at 1;

- Elsewhere in that same document, where Yeshitela explains that (1) Ionov's agenda is the same as that of Russian President Vladimir Putin, (2) APSP and Ionov are in the same alleged struggle, but that (3) "you can base your unity on what your interests are, traveling towards realizing your interests," GX104M-1 at 5;

- A February 1, 2016 message sent to Ionov by Defendant Hess on behalf of Yeshitela wherein Yeshitela admits that the Defendants "entered this

13

relationship with the Anti Globalization Movement of Russia as ALLIES, not employees!," GX102E at 28;

- Internal meeting notes from the Defendants wherein Hess describes "leverag[ing] the relationship with the Russians" to advance the shared agendas of both APSP and the Russians, GX154M at 3; and

- Internal meeting notes from February 2016 wherein Yeshitela, after APSP's four-city protest tour, explains that they undertook the action because the "Party developed a relationship with forces in Russia," who had "asked for a big mobilization," and that APSP and Russia are "in [a] process—Russians have to justify their getting resources for this" so that "they want information to work with," GX 106CC at 1.

This evidence establishes that the Defendants and Ionov entered into an "agreement"—as partners, as allies, and as conspirators—wherein Ionov would direct the Defendants to act in the United States as agents of the Russian government. In so acting, the Defendants would take actions that benefit both APSP and Russia—who, according to the Defendants, were in the same "struggle" against the United States.

Additionally, the evidence at trial proved that the Defendants knew that Ionov was working on behalf of the Russian government. Specifically, Defendant Yeshitela expressly stated at a meeting with Defendants Hess and Nevel that the "Anti-Globalization Movement of Russia is a solid institution of Russian politic," and that "it is clear that it is [an] instrument of Russian government." GX104M at 2; GX104RR (sharing with Defendant Romain).

The Defendants do not challenge any of this evidence—in fact, they describe it as "mostly undisputed." Doc. 308 at 4. They are correct. And this evidence is more than sufficient to support the jury's guilty verdict in this case, as a "rational trier of

14

fact" could have found (and did find) that this evidence proved the element beyond a reasonable doubt.

The Defendants devote much of their motion to the testimony of FBI Special Agents Kelly Bowen, Anna Meyers, and Iry Drupp.  Doc. 308 at 6-11.  The point being, apparently, that "[t]he Government's three case agents each conceded that at no point in time did the Defendants act under the direction or control of Ionov or the AGMR."  *Id.* at 6.  But this is factually wrong.  The evidence detailed above was admitted through and supported by the testimony of Special Agents Bowen, Myers, and Drupp.  This evidence overwhelmingly establishes that the Defendants agreed, partnered, and conspired with Ionov and the Russian government—which is more than sufficient to defeat the Defendants' instant motion.

More to the point, the Defendants' motion concedes that they entered into a conspiracy in this case: "All the evidence showed that Defendants entered into a partnership or an alliance with Ionov in which they agreed to cooperate on areas of common interest and belief."  Doc. 308 at 10.  As the Court instructed the jury, a conspiracy is "a kind of '*partnership*' for criminal purposes."  Doc. 284 at 11 (emphasis added).  Elsewhere in their motion, the Defendants make similar concessions.  For example, the Defendants admit that Special Agent Myers testified about documents wherein Ionov described his relationship with the Defendants as "a bilateral cooperation program."  Doc. 308 at 11.  But a rational juror could readily conclude that such a relationship is exactly the kind of "agreement" required to support a conspiracy conviction.

Second, the Defendants contend that they are entitled to an acquittal because there was, supposedly, "no evidence that Defendants had knowledge of their alleged requirement to register with the Attorney General as foreign agents."  Doc. 308 at 13.  According to the Defendants, this lack of evidence "created a fatal variance with the indictment" which requires acquittal.  *Id.*  This argument is legally flawed and therefore should be denied.  The Eleventh Circuit has held that under Section 951 "knowledge of the notification requirement need not be proven by the government." *United States v. Duran*, 596 F.3d 1283, 1292 (11th Cir. 2010).  The *Duran* court further held that the same is true where, as here, a defendant is charged with conspiring to violation Section 951. *Id.* at 1296 ("Although conspiracy is a specific intent crime . . . those theories of vicarious liability do not import into either the conspiracy charge or the substantive offense under § 951 that [a defendant] be on actual notice of the registration requirement." (citations omitted)).  Put simply, under *Duran*, the United States was not required to prove—in support of either Count 1 or Count 2—that the Defendants had knowledge of the requirement to notify the Attorney General of the United States.

The Defendants object that applying *Duran's* clear holding amounts to a "fatal" variance from the indictment, which alleged that the Defendants "knowingly and willfully" entered into the conspiracy.  Doc. 308 at 13.  But this argument likewise misses the mark.  First, as the Court made clear when it rejected this same argument during trial, the jury instruction in *Duran* also included the term "willfully" in its conspiracy instruction—and the Eleventh Circuit took no issue with it.  Second, the

Court here instructed the jury that, to convict on Count 1, the United States had to prove that the Defendants "willfully" joined the conspiracy.  Doc. 284 at 11 (conspiracy instruction).  The Court then elaborated that "willfully" in this context "means that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids; that is with bad purpose either to disobey or disregard the law." *Id.*  Thus, the Court's instructions in this case mirror the allegations in the Superseding Indictment.  Because there was no variance between the instructions, the proof at trial, and the Superseding Indictment—let alone a fatal one—the Defendants' argument must be rejected.

Third, the Defendants assert that the jury's guilty verdict should be set aside because of a supposed "inconsistency."  Doc. 308 at 13.  To begin, the jury's verdict in this case was not inherently inconsistent: the jury could logically and coherently conclude that the Defendants entered into an agreement to act as foreign agents of the Russian government and that they took at least one overt act in support thereof within the Middle District of Florida, but that they never actually acted at the direction or control of the Russian government within this District.  *See generally United States v. Corley*, 824 F.2d 931, 935 (11th Cir. 1987) ("[C]onspiracy and the related substantive offense which is the object of the conspiracy are considered separate and distinct crimes.  An acquittal on the substantive count does not foreclose prosecution and conviction for a related conspiracy.")*; United States v. Coleman*, 710 Fed. App'x 414, 416 (11th Cir. 2017) (affirming jury verdict finding defendant guilty of conspiracy but not guilty of related substantive count).  In any event, even assuming *arguendo* that the

verdicts are inconsistent, the Eleventh Circuit has made clear that "[c]onsistency in the verdict is not necessary." *United States v. Loya*, 229 Fed. App'x 913, 916 (11th Cir. 2007) (quoting *United States v. Odom*, 252 F.3d 1289, 1298 (11th Cir. 2001)); *see also United States v. Motes*, 196 Fed. App'x 877, 881 n. 1 (11th Cir. 2006) ("It is well-settled that so long as a guilty verdict is supported by sufficient evidence . . . a conviction will be affirmed, even if the guilty verdict is inconsistent with the jury's verdict as to other counts.").

Fourth, Defendant Romain also contends that the United States failed to carry its burden as to the conspiracy charge, including because Romain's "sole contact, Ionov, was not a member of the Russian government, and [Romain] never communicated with a member of the Russian government indirectly or directly at any point during the conspiracy." Doc. 304 at 10. But as the Court instructed the jury, Defendant Romain could act at the "direction or control" of the Russian government even if that relationship was intermediated by a middleman. Doc. 284 at 19 ("Direction or control may be established . . . via indirect contact through an intermediary or intermediaries."). Here, that is what the evidence proved at trial: Romain agreed to act at the direction or control of the Russian government, with Ionov acting as the middleman intermediary. *See, e.g.*, GX 104RR and attachments (email showing Romain's knowledge that Ionov was an "instrument" of the Russian government); GX 37 (video of Romain dancing in front of the Georgia state capitol and boasting about Black Hammer's links to "the Kremlin").

### B. No New Trial is Required and the Rule 33 Motion Should Be Denied.

In the alternative, Defendants raise seven arguments in support of their Rule 33 motion.  Doc. 308 at 15-31.  Here, too, each argument is without merit.

<u>First</u>, the Defendants object to the Court's jury instruction on the conspiracy charge, claiming that, as a result of the flawed instruction, "the Government misled the jury to obtain a wrongful conviction."  *Id.* at 15.  Specifically, the Defendants take issue with the fact that the Court did not embed the elements of the substantive Section 951 charge within the conspiracy instruction.  *Id.*  Separately, the Defendants repeat certain objections—detailed above—regarding the Court's instruction that an agreement "is a kind of 'partnership' for criminal purposes."  *Id.* at 16, n. 5.

To begin, the Defendants cite no case law whatsoever in support of the idea that a conspiracy instruction must repeat the elements of the conspiracy's object.  Nor is it required under the Eleventh Circuit's Pattern Instruction O13.1, which is what the Court modeled its instruction on in this case.  And that is for good reason: the instructions as to the object of this conspiracy—i.e., the Section 951 charge—were set forth in a standalone instruction that *immediately followed* the conspiracy instruction. Doc. 284 at 10-20 (setting forth the offense-specific instruction for Count 1 – Conspiracy and Count 2 – Acting as Agents of a Foreign Government).  Finally, the language to which the Defendants object regarding partnership is drawn verbatim from Pattern Instruction O13.1, which likely explains why the Defendants themselves included it in their proposed instructions to the Court.  Doc. 260 at 21 (setting forth

Defense Instruction No. 11, which states that an agreement "is a kind of 'partnership' for criminal purposes.").

Second, the Defendants challenge the Court's refusal to instruct the jury that "evidence offered against Romain, following his expulsion in 2018 from APSP, cannot be considered against APSP Defendants Yeshitela, Hess and Nevel." Doc. 308 at 20. Contrary to the Defendants' claim, however, the Court did give a limiting instruction to the jury, instructing that the jury "must consider each crime and the evidence relating to it separately" and that it "must consider the case of each Defendant separately and individually." Doc. 284 at 26.

The Defendants' real contention appears to be that Defendant Romain left the conspiracy in 2018 and/or that there were two separate conspiracies. Doc. 308 at 20-21. But as the Defendants concede, *id.* at 21, the Court previously rejected similar arguments when it denied their motion to sever. Doc. 211. The Court should do the same here. The Eleventh Circuit has held that a single conspiracy exists where a "defendant's actions facilitated the endeavors of other co-conspirators or facilitated the venture as a whole." *United States v. Edouard*, 485 F.3d 1324, 1347 (11th Cir. 2007). Here, the evidence at trial established that Yeshitela's and APSP's conspiracy with Ionov—of which Romain was indisputably a part, GX 104RR—facilitated Romain's continued partnership with Ionov via Black Hammer. Moreover, Romain's continued partnership with Ionov after 2018 had the same common purpose as Yeshitela and APSP's: to sow division inside the United States on behalf of the Russian government. Given these facts, "[i]t is irrelevant that particular conspirators may not have known

20

other conspirators or may not have participated in every stage of the conspiracy; all that the government must prove is an agreement or common purpose to violate the law and the intentional joining in this goal by co-conspirators." *Edouard*, 485 F.3d at 1347.

Third, the Defendants seek a new trial based on certain topics raised during the United States' redirect examination of Special Agent Bowen.  Doc. 308 at 21-25.  The crux of the Defendants' objection concerns an audio recording of a January 15, 2016 meeting involving the Defendants and other APSP members.  *Id.* at 21.  Critically, it was *the Defendants*—and not the government—who put this eighty-one minute recording into evidence.  *Id.* at 22.

During their cross-examination of Special Agent Bowen, the Defendants introduced the full audio recording into evidence, played a portion of the recording for the jury, and then elicited testimony about the recording's contents.  Unsurprisingly, the Defendants directed the jury's attention to portions of the audio recording that focused on the Defendants' supposed reasons for undertaking the four-city protest tour, which, according to the Defendants, was exculpatory.  *Id.* at 21 (claiming the recording "directly refuted" the government's theory).

In response, during its redirect examination of Special Agent Bowen, the United States played a different portion of the recording in which Yeshitela and Romain discussed a proposal from Ionov wherein he and his organization would help the Defendants create a website intended to dox—that is, to provide the names and photos of—police officers and judges.  DX81, Doc. 295-33; Transcript at 2-3, 5, 52-53, Doc.

305-1.  The audio recording corroborated other evidence admitted during trial, including internal meeting notes from that same January 15, 2016 meeting, and also refuted Romain's contention that he had not participated in the conspiracy with the Russians as a member of the APSP.  GX104VV-1 at 1-2.  These notes make clear that the focus of the January 15 meeting was "the proposals from AGM-Russia," which included a "website" that featured "[p]icture[s], names, addresses about the cops."  *Id.* The notes further make clear that Yeshitela and others saw value in the idea because it would "raise the prestige" of their organization "since we are in a contest with the FBI."  *Id.*

Without citing any precedent or legal authority for support, the Defendants contend that the government's use of an audio recording during its redirect examination—again, a recording that *the Defendants* put into evidence during cross examination—somehow "requires a new trial."  Doc. 308 at 24.  But the fact that Ionov proposed the idea for a doxing website, GX104VV-1, and that the Defendants' engaged in a discussion weighing the benefits of pursuing the idea, Doc. 305-1 at 2-3, was directly relevant to proving the existence of a partnership and agreement between the Defendants and Ionov.  This, in turn, goes to the heart of the charges in this case, including the conspiracy of which the Defendants were convicted.  Thus, the Defendants' claims to the contrary—that such evidence was somehow "irrelevant," Doc. 308 at 24—are wrong.

Nor was there anything improper about the phrasing of the questions asked by the government during the redirect examination.  *Id.* at 22-24.  The Court instructed

the jury that "[e]vidence includes the testimony of witnesses and the exhibits admitted," but made clear that "anything the lawyers say is not evidence and isn't binding on you." Doc. 284 at 5. Here, Special Agent Bowen testified under oath that "doxing is when someone puts personal information about another individual online . . . like their . . . name and address, something like that." Sept. 9, 2024 Tr. at 140:21-23. Nothing about that testimony was misleading because, as the audio recording and related evidence make clear, the Defendants were in fact discussing a proposal from Ionov and the Russians wherein they would build a "website" to feature the "picture[s], names, [and] addresses about the cops." GX104VV-1 at 1-2. Indeed, defense counsel—who were the only ones to discuss this recording in closing arguments—also characterized the website as a "website that would docks (sic) rogue police officers or prosecutors or judges." Sept. 10, 2024 Tr. at 106.

Fourth, the Defendants argue it was error for the Court to deny their request to add a sentence to the jury instruction for Count 2. Doc. 308 at 26. As the Eleventh Circuit has made clear, "judges are given great discretion with respect to the submission of jury instructions . . . ." *United States v. Grant*, 211 F. App'x 889, 894 (11th Cir. 2006). Here, the Court gave a careful instruction as to the meaning of Section 951's phrase "direction or control," explaining:

> A foreign government or official's involvement in the relationship does not need to be that of an employer of the Defendant—a lesser degree of control is sufficient. A person who operates subject to a more hands-off form of direction would also be operating as an "agent of a foreign government."

Doc. 284 at 18-19.  Elsewhere in the same instruction, the Court stated that to be a foreign agent, "a person must do more than act in parallel with a foreign government's interests or pursue a mutual goal.  The Government must prove that the Defendant acted subject to the direction or control of the Russian Government or an official thereof."  *Id.* at 18.

The Defendants contend that this instruction was fatally flawed because it did not include a single additional sentence that they proposed, namely: "It is not enough for [an individual] to simply be willing to do something the foreign principal requests." Doc. 308 at 26.  For support, the Defendants cite to a single out-of-circuit decision and to interpretative guidance issued by the Department of Justice about an entirely different statute, the Foreign Agents Registration Act, or FARA.  *Id.* at 26-27.  But the instruction given by the Court mirrors the instructions given in several other cases, Doc. 234 at 17 (collecting cases), and is far more expansive than the instruction given in *Duran*.

The instruction as given "correctly applie[d] the law and state[d] the facts." *United States v. Anderson*, 326 F.3d 1319, 1330-31 (11th Cir. 2003).  It tracked Section 951's statutory language and the relevant case law interpreting it.  As a result, the Court for good reasons declined to give the Defendants' proposed instruction, as it was unnecessary and redundant with the instruction as given.  The Court should affirm its earlier ruling and reject the Defendants' argument.

<u>Fifth</u>, the Defendants renew arguments—rejected by the Court during trial— that it was error to introduce co-conspirator statements made by several Russian FSB

Officers in furtherance of the conspiracy.  Doc. 308 at 27-28.  As the United States has previously argued, Doc. 236, Federal Rule of Evidence 801(d)(2)(E) provides that a statement is not hearsay if it "is offered against an opposing party" and "was made by the party's co-conspirator during and in furtherance of the conspiracy."  In order for such statements to be admissible, the government must prove that (1) a conspiracy existed; (2) the conspiracy included the declarant and the defendant against whom the statement is offered; and (3) that the statement was made during the course and in furtherance of the conspiracy.  *United States v. Miles*, 290 F.3d 1341, 1351 (11th Cir. 2022).  Post-trial Eleventh Circuit precedent further makes clear that the United States need not even establish that "a conspiracy was unlawful to introduce coconspirator statements," but that statements made "during and in furtherance" of *any* joint venture involving the defendant suffices.  <u>*United States v. Holland*, 117 F.4th 1352, 1354 (11th Cir. 2024).</u>

In making this determination, "the district court may rely on information provided by the co-conspirator's proffered statement as well as independent external evidence."  *Miles*, 290 F.3d at 1351.  The Eleventh Circuit has made clear that courts must apply "a liberal standard in determining whether a statement is made in furtherance of a conspiracy."  *Id.*  Rule 801(d)(2)(E) thus covers statements that, for example, were intended "to affect future dealings between the parties, that provide reassurance, that serve to maintain trust and cohesiveness, or that inform other conspirators of the current status of the conspiracy."  *United States v. Wenxia Man*, 891 F.3d 1253, 1271 (11th Cir. 2018). The Defendants challenge the Court's decision to

admit various communications between Ionov and his government handlers, namely FSB Officers Popov, Sukhodolov, Mityagin, and Vistoropskiy.   But these co-conspirator communications—wherein the FSB Officers gave direction to Ionov, encouraged and praised Ionov's work with the Defendants, demanded additional reports from him about the Defendants' actions, and gave guidance about who supervised Ionov—were all the sorts of statements that would have "affected the future dealings between the parties," "provide[d] reassurance," and generally "serve[d] to maintain trust and cohesiveness."   *Wenxia Man*, 891 F.3d at 1271.   In fact, the Defendants themselves recognized that the reporting relationship between Ionov and his Russian government handlers was critical to the broader conspiracy: as Yeshitela explained, "[n]ow we are in [a] process—Russians have to justify their getting resources for this," and so "they want information to work with."   *See* GX106CC at 1 (internal APSP meeting notes explaining why the Defendants undertook an action proposed by the Russians and how the sharing of information about that action yielded additional funds and resources from the Russians).

Sixth, the Defendants also seek a new trial on grounds that the Court denied their request "to replace the sole black juror with the sole black alternate [juror]."   Doc. 308 at 28-29.   On the fifth day of trial, an African-American juror failed to show up and was excused from the jury.   Doc. 278 at 1.   The Court followed the normal course and sat the first alternate juror.   *Id.*   During trial—and again here—the Defendants objected to the Court's decision and instead sought to seat a different alternate juror, who was also African-American.   But the Defendants' request is flatly contrary to

Federal Rule of Criminal Procedure 24(c)(2)(B), which provides that "[a]lternate jurors replace jurors *in the same sequence in which the alternates were selected*." (emphasis added). Thus, the Court appropriately followed Rule 24(c)(2)(B) and the Defendants have offered no legal authority that supports overriding the same. The Court should reaffirm its earlier decision and reject the Defendants' argument. *See United States v. Brewer*, 199 F.3d 1283, 1286 (11th Cir. 2000) (holding that the "use of a random draw" to seat alternate jurors was an "error by violating the explicit command of Fed. R. Crim. P. 24(c)").

Seventh, and finally, the Defendants contend that a new trial is warranted because the Court erred by admitting testimony from two experts, Profs. Brian Taylor and Thomas Rid, about (1) the structure, organization, and operation of the Russian state, and (2) the historical use by Russian intelligence services of "active measures," i.e., covert actions intended to achieve foreign policy through the manipulation of information and exploitation of emotionally charged and divisive topics. As explained in pretrial briefing, Profs. Taylor and Rid are qualified, their opinions are reliable, and their testimony was necessary for the jury to understand the evidence and make factual determinations material to this case. Doc. 206 at 1. The Defendants argue that "the jury did not need help understanding that Ionov was serving as a confidential informant." Doc. 308 at 30. But that misunderstands the evidence at trial and the purpose for which the government called Profs. Taylor and Rid at trial. To begin, Ionov was not a "confidential informant"—he was an asset working on behalf of the Russian government "to utilize forces inside the U.S. to sew [sic] division inside the

U.S." GX104RR at 1. Furthermore, the testimony by Profs. Taylor and Rid was directly relevant to establishing that the Defendants—through Ionov—were acting at the direction or control of the Russian government. Significantly, Prof. Taylor testified that FSB Officers—as the evidence would later establish included Popov, Sukhodolov, and others working with Ionov—are, in fact, Russian intelligence officers who are a part of the Russian government. Prof. Taylor also gave context to various communications between Ionov and these FSB Officers that referenced concepts unfamiliar to a lay audience. Similarly, Prof. Rid testified about the concept of "active measures" and explained that Russian intelligence services had a history of using these covert operations to achieve foreign policy objectives—which is exactly what occurred in this case. The Court correctly denied the Defendants' prior motion in limine, Doc. 213, and should reaffirm that decision here.

## V.    CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny the Defendants' motions for a judgment of acquittal and for a new trial.

Respectfully submitted,

ROGER B. HANDBERG                By: *s/ Daniel J. Marcet*
United States Attorney              DANIEL J. MARCET
                                    RISHA ASOKAN
                                    Assistant United States Attorneys
                                    Florida Bar No. 0114104
                                    400 N. Tampa St., Ste 3200, Tampa, Florida
                                    813/274-6000 | Daniel.Marcet@usdoj.gov


JENNIFER K. GELLIE              By: *s/ Menno Goedman*
Chief, Counterintelligence and     MENNO GOEDMAN
Export Control Section             Trial Attorney, National Security Division
                                   950 Pennsylvania Ave. NW, Washington, DC
                                   (202) 451-7626 | Menno.Goedman@usdoj.gov

**U.S. v. Omali Yeshitela et al.**          **Case No. 8:22-cr-259-WFJ**

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

_s/ Menno Goedman_

MENNO GOEDMAN
Trial Attorney, National Security Division
950 Pennsylvania Ave. NW, Washington, DC
(202) 451-7626 | Menno.Goedman@usdoj.gov